Watson *v.* Murray.

---

WATSON *vs.* MURRAY and others.

1. Uncertainty in material allegations is not fatal to a bill whose object is the discovery of material facts alleged to be entirely in the defendant's knowledge.

2. A bill by a partner of a lottery firm against his co-partners for discovery, for a sale of the property, and a distribution of the proceeds, will not be entertained by this court.

3. Even were the partnership contracts entered into in such states where such contracts are legal, this court will not enforce or administer them.

4. A contract which, though valid and would be enforced in the state where it was made, is in violation of a public law of this state, will not be enforced here, on the ground of comity.

5. It will not avail the complainant that his suit is not to enforce an illegal contract, but simply to compel an account and distribution of profits already made. Such distinction cannot be invoked where the illegal act is also a misdemeanor, punishable by fine or imprisonment.

---

The argument was had before the Vice-Chancellor, on demurrer to the bill.

Watson v. Murray.

*Mr. I. W. Scudder*, for demurrer.

*Mr. L. Zabriskie* and *Mr. Knapp*, contra.

THE VICE-CHANCELLOR.

James S. Watson, the complainant, was one of a firm engaged in the business of lotteries, and his bill is filed to obtain a discovery from the other partners, or some of them, of the profits and assets belonging to the firm; to have the partnership dissolved, a receiver appointed, the property sold, and the proceeds distributed among the partners according to their respective rights.

The bill alleges, in substance, that Charles H. Murray and twenty-one others besides the complainant, had been for three years associated under the name of C. H. Murray & Co., owning lottery franchises, granted by the states of Missouri, Virginia, Kentucky, and Louisiana; that the legislation creating them was designed to raise money for lawful and commendable purposes, but the complainant is unable to set forth the dates or particulars of the several statutes composing it; and prays that the defendants may discover the same in their answer. It alleges that the lotteries were drawn and the business carried on in the above-mentioned states, or some of them, and in accordance with their laws; that lotteries and lottery franchises are lawful property in said states, and that contracts growing out of the same are there upheld and protected. It alleges that the property of the firm was divided into one hundred and twenty shares, of which the complainant owns two and one-half, and for which $20,000 were paid by him; that the defendants, or some of them, who have charge of the business, have realized large sums and have appropriated or invested them in their own name, and refuse to give any account thereof; that they have possession of all the books, papers, and muniments of title, and that complainant is unable to get access thereto or any information respecting them.

The defendants, by whom the business is charged to have

been mainly conducted, are Charles H. Murray, Zachariah E. Simmons, John A. Morris, Benjamin Wood, William E. France, Charles T. Howard, Jacob Bausch, and Lewis Davis.

A demurrer has been filed by Murray, the only defendant served with process or appearing to the suit. The causes of demurrer are special and general, the former being the uncertain and defective averments of the bill, and the latter the substance or subject matter of it. The subject matter, it is said, is such as this court will not take cognizance of, and that if this were not so, the allegations of the bill in regard to the particulars of the lottery grants, the assignments of them to the firm, and the nature and location of the property, are all too indefinite and vague to entitle the complainant to an answer. The want of certainty in these respects, and in others not assigned in the demurrer, would undoubtedly be fatal if the bill were not one for discovery. But the complainant insists that he is utterly unable, more specifically, to set out his title, because his sources of information are entirely in the defendants' possession. It is conceivable that a partner might embark in a legitimate business, relying on his associates, without having or retaining any more specific information respecting it than is disclosed in this case, and if he had so invested his money and become subject to the co-members of the firm, no rule of pleading could possibly prohibit his right to discovery. On the contrary, the defendants, however meagre the allegations of the bill, would be held to supply the deficiencies. This is the very object to be gained by the suit.

But is the suit itself, in the most favorable statement to be made of it, one which this court will entertain? It seems to me plain that it is not. Its object is to consummate a partnership contract, entered into and continued exclusively for the prosecution of an illegal and mischievous business. By the law of New Jersey, lotteries are common and public nuisances. Any one selling or disposing of a ticket in a lottery, whether erected, opened, or made in this state or elsewhere, is guilty of a misdemeanor, and on conviction punishable

by fine and imprisonment. Every bargain, sale, conveyance, or transfer of any goods, chattels, or lands, made in pursuance of any such lottery, is invalid and void. These provisions are a part of the act of February 13th, 1797. The hostility they exhibit to lotteries, whether organized in this state or out of it, is, and has long been the settled policy of the state. This policy is manifested in our state Constitution, and is incompatible with any exercise of comity, by which lottery contracts or lottery transactions, however lawful in other states, can be recognized and enforced by our courts. Whether the partnership contract in this case was entered into by the complainant in this state, where it would be illegal and void, or in states where it may have been legal, does not distinctly appear. It is to be presumed from the pleadings that it was entered into here. But putting the case in its best possible shape, and assuming that all the contracts and transactions involved in it occurred in states where they were tolerated by law, my opinion is that this court will not undertake to enforce or administer them.

In 2 *Kent's Comm.* 457, it is said: "There is no doubt of the truth of the general proposition, that the laws of a state have no binding force beyond its territorial limits ; and their authority is admitted in other states, not *ex proprio vigore*, but *ex comitate*. Every independent community will judge for itself how far the *comitas inter communitates* is to be permitted to interfere with its domestic interests and policy. It may be laid down as the settled doctrine of public law, that personal contracts are to have the same validity, interpretation, and obligatory force in every other country, which they have in the country where they were made. The admission of this principle is requisite to the safe intercourse of the commercial world, and to the due preservation of public and private confidence ; and it is of very general reception among nations. It is, however, a necessary exception to the universality of the rule, that no people are bound to enforce or hold valid in their courts of justice, any contract which is injurious to their public rights, or offends their morals, or contravenes their policy, or violates

a public law." The gambling operations of lotteries are within these exceptions. They were insisted at the argument to be *mala prohibita*, and not *mala in se*. I think they are to be taken judicially, if not abstractly in ethics, as *mala in se*; bad in their nature, and bad in their results; notoriously prejudicial to the interests and the morals of the public. Their enticing illusiveness is a fraud. They were described nearly a century ago in Adam Smith's Wealth of Nations. "The world," he says, "neither ever saw, nor ever will see, a perfectly fair lottery, or one in which the whole gain compensated the whole loss; because the undertaker could make nothing by it. There is not a more certain proposition in mathematics, than that the more tickets you adventure upon, the more likely you are to be a loser." But it is wholly superfluous to enlarge on the pernicious and illegal character of the business, or do more than state it. It is eminently one to which the maxim applies *ex turpi causa non oritur actio*. "The objection," says Lord Mansfield, "that a contract is immoral or illegal, as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded in general principles of policy. No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." *Holman* v. *Johnson*, *Cowp*. 343.

But it was contended for the complainant, and the argument of his counsel went mainly on the ground, that the court, in this case, is not asked to do anything in furtherance of lotteries, or to enforce an illegal contract, but simply to compel an accounting and distribution of the profits. This distinction between enforcing illegal contracts and asserting title to money which has arisen from them, has been taken in authoritative cases, which were strongly urged and relied on at the argument.

In *Sharp* v. *Taylor*, 2 *Phillips* 801, it was held that one of two partners who has possessed himself of the property of the firm, cannot be allowed to retain it, by merely showing that on realizing it some provision of some act of Parliament has

been violated or neglected. The parties there were joint owners of a vessel. Freights had been earned in her voyages, and the vessel had been sold. The partners holding the proceeds of sale and the freights, set up violations of the laws regulating navigation and freights as a ground of defence in a suit for account. The alleged violations of law, Lord Cottenham said, were not any fraud upon the revenue, or omission to pay what might be due, but at most an invasion of a parliamentary provision supposed to be beneficial to the shipowners of the country—an evil, if any, which must remain the same, whether the freight was or was not divided between the parties according to their shares. But the partners, in that case, did not enter into partnership to carry on an illegal business, or, so far as appears, to violate the law, in the prosecution of a legal one. Some part of the partnership gains appeared to have resulted from a breach of a purely positive law. The court directed an account of the whole.

In *McBlair* v. *Gibbes*, 17 *Howard* 232, and in *Brooks* v. *Martin*, 2 *Wallace* 70, the distinction expressed by Lord Cottenham in *Sharp* v. *Taylor*, is recognized and approved.

In *McBlair* v. *Gibbes*, the claim sought to be recovered, grew out of a contract with one Mina, in 1816, for advances and supplies in fitting out a military expedition against the dominions of the king of Spain. But the contract relied on by the plaintiff was, in that case, not the original one in contravention of the act of neutrality, but was subsequent, collateral to, and wholly independent of it. The distinction on which the decision was made, was not between enforcing the illegal contract and distributing its proceeds, but the distinction between an original contract tainted with illegality, and a later one not affected by the taint. In *Brooks* v. *Martin*, the business of the firm related to the purchase and sale of bounty land warrants and scrip, a traffic which the act of Congress prohibited. The object of the act was to protect soldiers against improvident contracts, and while the assets of the firm were adjudged to have resulted from such contracts, the partner holding the assets was decreed to account

to the other, and pay over his share; the court saying that it was difficult to see how the statute enacted for the benefit of the soldier would be made more effective by leaving one to hold on to the whole of the property, instead of executing justice between himself and his partner.

But, in these cases, as well as in other cases which are therein cited and reviewed, the partnership was in no instance formed and conducted for a traffic which the law made a crime and a nuisance. The distinction between enforcing the execution of an agreement to do an illegal act, and the distribution of the realized profits of the act, made use of in those cases to do justice between the parties, is obviously not to be regarded as one of universal or general application. It would seem needless to say that it cannot be invoked to apportion among criminals the gains resulting from their crimes. No case has been referred to, and none, I am sure, can be found, where the illegal act has been also a misdemeanor, punishable by fine and imprisonment, for the protection of the public safety and morals. Where such is the fact, the distinction is excluded by manifest considerations of example and influence; considerations not deemed to exist in the cases where the distinction was allowed. I cannot regard the authorities relied on in this case as at all available to maintain it.

In *Watson* v. *Fletcher*, 7 *Grattan* 1, a suit to effect a settlement of transactions growing out of a partnership for gambling, the Supreme Court of Appeals of Virginia refused to give relief, declaring it clear that a court of equity would not lend its aid in such cases to either partner against the other. See also *Alford* v. *Burke*, 21 *Ga.* 46 ; *Abbe* v. *Marr et al.*, 14 *Cal.* 210 ; *Spalding* v. *Preston*, 21 *Vt.* 9.

In the latter case, it was said that courts of justice will not sustain actions in regard to contracts or property which have for their object the violation of law. If a gang of counterfeiters had quarreled about the division of their stock or tools, a court of justice could hardly be expected to sit as a divider between them.

If this lottery firm had made its contracts, sold its tickets,

and accumulated its property in New Jersey, the above language of Chief Justice Redfield would appropriately describe it. This being true, no principles of comity can render it, if carried on elsewhere, legitimate or reputable here.

I shall advise that the bill be dismissed, with costs.