SARAH E. WINANS, appellant,

*v.*

HORACE GRAVES, respondent.

1. A party to whom a judgment has been assigned in pursuance of an understanding with the judgment debtor that the assignee shall hold the same for the purpose of protecting the defendant's property from the claims of his creditors, will receive no aid from a court of equity in reaching and applying to the payment of the assigned judgment property which the judgment debtor has placed in the name of a third party in fraud of his creditors.

2. In a suit brought by a creditor of a fraudulent vendor to charge a judgment upon land formerly owned and fraudulently conveyed by such vendor, and which, after several intermediate conveyances, through parties who each took title with notice of the fraud, finally reached an innocent vendee, who paid a part of the purchase-money, the immediate grantor to such vendee should be made a party to the suit. If no objection is made to the absence of such party till final hearing, the court may still, in its discretion, refuse to make a decree in the cause.

On appeal from a decree advised by Washington B. Williams, advisory master, who filed the following conclusions:

It is undisputed that Lilliston, prior to 1875, owed Wild a debt, for which Wild got judgment against Lilliston in the Brooklyn city court, April 19th, 1875, for $1,100.

Graves, Lilliston and Middleton testify that this judgment was assigned to Middleton under the following circumstances: Lilliston was in difficulty in 1874, by having failed to account for some funds belonging to the Wardell heirs, for whom he was guardian, and, to save himself from arrest, gave a mortgage for $2,800 to one Mrs. Voss, for the heirs, on some lots on Halsey street, Brooklyn. In order to make this a first lien it was necessary to pay off an existing mortgage on the lots. This required $750, which Middleton advanced to Lilliston for that purpose, taking, as partial security, a deed for the Halsey street lots, subject to the Voss mortgage. Subsequently it was agreed between Lilliston and Wild to convey these lots to Wild for his debt, first freeing them from the Voss mortgage by its cancellation, which Wild undertook to get from Mrs. Voss. To induce her to do this, Wild (her attorney) was to sue the sureties on the bond of Lilliston as guardian, and it was explained to her that the lots were worth considerably less than her mortgage, and that she would be better off by relying on her legal remedy against the sureties than by holding the mortgage. This was true to some extent; the lots were not worth the $2,800; Mrs. Voss did cancel the mortgage, and Wild sued the bondsmen, and ultimately recovered some $800 for the Wardell heirs.

To carry out this agreement, the Voss mortgage being canceled or ready to cancel, it was necessary to get in Middleton's title to the Halsey street lots. His deed had not been recorded, but Wild and Lilliston knew of it. Lilliston had in the meantime given a deed for the same lots to Logan, as security for another indebtedness, and Logan's deed was recorded. Lilliston got Logan to convey; and as to Middleton, it was agreed that on his surrendering his deed to be destroyed, the Wild judgment should be assigned to him as security for his claim. Wild exe-

cuted accordingly an assignment in blank, and on the completion of the matter, Middleton's name was filled in, and the assignment delivered to him as agreed.

This history is sustained by the testimony of Graves, Lilliston and Middleton. Wild is not sworn, but a conversation with him is testified to by several of the defendant's witnesses, in which he said he had sold or assigned the judgment, not to Middleton, however, but to one Runyon. Runyon is sworn for the defendants, but does not sustain this. There is no testimony to shake the statement of the three witnesses mentioned. Some discrepancies appear in Middleton's evidence, and some differences exist between his testimony here and that which he gave on the same points in another suit in Brooklyn. But on the whole, I must conclude that the above history is established in this case.

These facts place Middleton in the position of a *bona fide* holder of the judgment by assignment, to secure his claim against Lilliston. The judgment was satisfied in Wild's hands by the conveyance of the lots to him for so much as exceeded Middleton's claim. But Middleton, in consideration of the surrender of his title to the lots, was, by the agreement of all parties, to receive the judgment in lieu thereof to the extent of his claim. I think he has failed to prove a claim over $750, being unable to specify or explain the loans he says he made to Middleton beyond that sum, for political purposes, and he must be restricted to that sum ; but on the whole evidence, I think he is corroborated to that extent.

Graves, the complainant, stands in the shoes of Middleton, having merely taken an assignment of the judgment, and can recover no more than his assignor could—that is, $750, with interest at least from the date of Wild's judgment. The $750 were advanced before that date, and at some time in 1874, but there is no evidence as to the agreement as to interest, or as to its payment ; and it will be near enough to adopt the date of the judgment as the starting-point for interest.

It is established, therefore, that a debt of $750, incurred prior to 1875, was owing by Lilliston when, on February 10th, 1875, Mrs. Lilliston received the legal title to the Bayonne lots. Let

us now look at the history of this title. It appears undisputed that Lilliston had caused certain lots on Macon street, belonging to him, to be placed in the name of one Mrs. Hale, to keep it out of the reach of his creditors. Placing property under cover of another name was a constant usage of his, as appears from the several instances stated in the evidence, and of which his wife was fully aware. He negotiated an exchange of this property with one Wiley for $1,500 cash and the Bayonne lots. In pursuance of this exchange, Mrs. Hale conveyed the property she held to Wiley, and Wiley conveyed the Bayonne lots to Mrs. Hale, who held them, as she had the former property, merely for Lilliston. She conveyed them to Mrs. Lilliston on February 10th, 1875, by Lilliston's direction, without consideration, and Mrs. Lilliston did not even know it at the time. Up to this point there is no divergence between the assertions of Mr. and Mrs. Lilliston. She does not claim to have paid or furnished any consideration for this conveyance to her, nor deny that the property so conveyed to her was Lilliston's. In her hands, then, it is free from doubt that the Bayonne lots were subject to the right of Lilliston's creditors to assert a trust for their benefit to the extent of their debts. It matters not whether Lilliston was solvent or not at the time, under the rule adopted in this state. But there is sufficient evidence that he was insolvent. And it appears that for a course of years he had been diligently keeping property in the names of one or another of his and his wife's friends and relations to defeat his creditors.

Mrs. Lilliston and her husband conveyed the Bayonne property by deed dated May 1st, 1876—acknowledged June 3d, 1876 —to one Catharine Dewing, a daughter of Mrs. Lilliston by a prior marriage, who has always lived with her. The consideration expressed was $100. The consideration in the deed from Mrs. Hale to Mrs. Lilliston was $8,500, and the evidence as to actual value is that the lots are worth about $2,000, and were unencumbered, so far as appears. Mr. Lilliston testifies that this conveyance was also by his direction, to cover the property from creditors, and that Miss Dewing paid nothing and did not know of the conveyance at the time.

Winans *v.* Graves.

Mrs. Lilliston, in her testimony, calls it a sale; says she sold it because she needed money, and received $100, cash. Mrs. Winans's answer admits that this conveyance was for the consideration thus expressed. Miss Dewing is not sworn as a witness at all. In view of all the evidence as to this transfer, the discrepancy in price, the coloring of Miss Lilliston's testimony, the non-appearance of Miss Dewing as a witness, and her connection with some of Lilliston's other schemes for covering up his property, I cannot believe that this was a *bona fide* transaction, and conclude that it was, as Lilliston testifies, another of his devices to defeat creditors. I doubt the payment of the $100, but if paid, it was not in good faith and does not avail.

Miss Dewing held the title until February 27th, 1882, when she conveyed it to Sarah E. Winans, a sister of Mrs. Lilliston, who is the present defendant, and who claims to be a *bona fide* purchaser for value.

Mrs. Winans was a widow lady of small means. She owned only a small place of twenty acres of farm and bush-land, three miles from Plainfield, New Jersey, only a small part cleared, and with a little house on it. She was supported by the earnings of her sons, who lived with her, with what little she could sell from her place or earn by manual labor. At the time of this conveyance she says she had only $100 in money, which she got from her son and had had about three months, and which she paid on the purchase, and that Catharine Dewing owed her $200 for produce and work of herself and her sons, and that other persons owed her perhaps as much as $100.

She says Miss Dewing first proposed that she should buy the lots; that she agreed to buy them for $1,000; that Miss Dewing insisted on having the consideration in the deed expressed at the amount actually paid—$100. Why pay this, the only money she had, when they owed her $200, and why did Catharine Dewing insist that it should be so unless there was some motive, some desire to make the transaction appear other than it was? Is not the key to this found in Mrs. Lilliston's testimony of another fraudulent conveyance, when she says Mrs. Breakey paid Lilliston $1 to make the transfer legal? This

debt, she says, was for produce and work previously furnished in the housekeeping, which Miss Dewing was responsible for, her mother having no income, while they lived at Plainfield, Dunellen and Evona. She produces no account or details for this debt. She did not see the lots she was buying. She did not make any search nor know anything about their condition, situation or value. No written obligation was asked or given for the $700 which she says she was still to pay after applying the $100 cash and the $200 indebtedness, nor was there any verbal promise or understanding as to when or how she should pay it, except that she was to pay as she could. No provision was made as to any evidence of indebtedness in case of her death. On November 11th, 1882, she says she paid another $100. One son was twenty-three, one nineteen, and one seventeen in July, 1884; the eldest was therefore not over twenty-one when she bought the lots, and the youngest fifteen.

It was a strange undertaking for a woman thus situated to buy vacant lots so far above her means, and taxed at some $30 or $40 a year. While family confidence might account for some of the particulars of the transaction, it bears no resemblance to an ordinary and *bona fide* affair. To say the least, such a history puts the burden of proof strongly on the person affirming its good faith. She does not sustain this burden or bring either Catharine Dewing or her sons as witnesses. She brings only Mrs. Lilliston, whose credibility is much impaired by her testimony as to the conveyance to Miss Dewing and as to other parts of the case.

On comparing Mrs. Winans's answer with her own and Mrs. Lilliston's testimony, we may observe that the answer states that the conveyance to herself was for the consideration, therein expressed of $100, and adds, "which sum of $100 was paid by this defendant to the said Catharine Dewing on the delivery to her of said deed." No mention is made of a bargain at the price of $1,000; this first appears when Mrs. Lilliston testifies.

Mr. Lilliston testifies that he told Mrs. Winans, in or about 1880, that he had taken this property out of his wife's name and put it into Catharine Dewing's name; and that he had before that told her, and told her then again, it was to protect himself

against his creditors, to keep them from getting hold of the property. This conversation came up, naturally enough, on the occasion of his going to get her to sign a satisfaction of a mortgage he had put in her name previously without her knowledge, and as she did not exactly understand it he says he explained to her how he had been putting property, from time to time, in the names of his wife, of Mrs. Breakey, another sister, Miss Dewing and others.

Mrs. Winans does not contradict this alleged conversation. If it took place it goes far to disprove her good faith; she can only escape on the ground of having forgotten it when she bought the lots. But she was not asked about it, although examined after Lilliston had stated it.

I do not, however, give full confidence to Mr. Lilliston's testimony, where not in some way corroborated.

The disagreement between Lilliston and his wife had not broken out in 1876, when the deed to Catharine Dewing was made. But in the early part of 1881 they separated, and it would seem that after that she determined to avail herself of the property which had been placed in her and her daughter's names. This is the only way to account for the sale to Mrs. Winans, if it was a sale.

If Mrs. Winans purchased in good faith, she can only be protected to the extent of the money she has paid; the pre-existing debt due her would not entitle her to protection. On her own evidence she has only paid $200.

But in view of the undisputed facts, and on weighing the conflicting and doubtful testimony, I cannot believe that she purchased in good faith. I think she knew the facts, and entered into the ostensible purchase at the suggestion of Mrs. Lilliston and her daughter so as to keep to themselves this property of Lilliston's from his creditors. It may be noticed that a suit was begun in Brooklyn by Middleton against Catharine Dewing to set aside an alleged fraudulent conveyance, and attempts had been made to serve the papers, which were finally served on March 2d, 1882. Miss Dewing made conveyances of both Brooklyn and Bayonne property just about this time.

It appears, however, that Miss Dewing paid several years' taxes on the Bayonne property, viz.: for 1875 to 1881, inclusive, on April 17th, 1882, amounting to $284.86. This was after the deed to Mrs. Winans, which was made about March 1st. Why Miss Dewing should advance the money for this purpose when, as alleged, Mrs. Winans then owed her $700 on the lots, and where the money really came from, are not explained.

But the tax receipts are produced, and the payment stands proved. To this extent, with interest, the present title should be protected.

A decree will be made that Mrs. Winans holds the property in trust for the complainant to the extent of his claim, under the judgment as before explained, after first satisfying her to the extent of the taxes paid, and the property will be sold to pay the claim in that order. Costs are awarded against her.

*Mr. C. H. Beasley* and *Mr. S. B. Ransom*, for appellant.

*Mr. F. D. Smith* and *Mr. Horace Graves*, for the respondent.

The opinion of the court was delivered by

REED, J.

The bill in this cause was filed by Robert Graves, assignee of a judgment against William H. Lilliston, to reach certain real estate now owned by Sarah E. Winans, but which, as the bill charges, was bought by Lilliston, the title put in his wife's name for the purpose of evading his creditors, and was conveyed by her to her daughter, Catharine Dewing, and by the last-named person to Mrs. Winans, a sister of Mrs. Lilliston.

Graves, the respondent, got the judgment from one Middleton, who was the assignee of the judgment creditor, Wild.

Wild was an attorney in the city of Brooklyn, and recovered the judgment in the Brooklyn city court on April 19th, 1875. This judgment is said to have been founded on a debt for fees and professional services which Lilliston owed Wild. Wild received from Lilliston full satisfaction for this judgment.

The payment was brought about in the following way: Lilliston had, as guardian of some infants, exchanged some of the property of his wards for other property, which, he says, subsequently depreciated in value. He was pursued, on behalf of the infants, for the cash value of the exchanged property. The court ordered him to execute a mortgage to a Mrs. Voss, one of the wards, who had arrived at her majority, in the sum of $2,800 to secure to the infants that sum.

He arranged to get the title to certain lots, known in this cause as the Halsey street lots, in such shape that he was enabled to give the required mortgage of $2,800 to Mrs. Voss for the Wardell infants.

It appears, however, that his difficulties in respect to the estate of these infants continued or were revived, for subsequently he was threatened with imprisonment on a proceeding to attach him for contempt for failing to do something in regard to his trusteeship, which does not very clearly appear.

The proceedings against Lilliston for an attachment for contempt were being pushed by a Mr. Burnett, a lawyer in Brooklyn, but Burnett's movements seem to have been controlled by Mr. Wild, who really represented the movement against Lilliston in the professed interests of the infants. Mr. Wild, at this juncture of affairs, concluded that the time to make his judgment had arrived. He represented to Lilliston that he had it in his power to stop the prosecution of the contempt proceedings, and that he would stop them if Lilliston would consent to do what Wild wished. He wished to get for his judgment the three Halsey street lots, free of encumbrance.

There was upon these lots the $2,800 mortgage for the security of the infants already mentioned. Wild proposed to rid the property of this encumbrance by advising Mrs. Voss that it was for the interest of the infants that she should release this property from the mortgage.

He told her that it was inadequate security and that the infants would do better by suing the sureties on Lilliston's bond. Acting under this advice, Mrs. Voss released the property from this encumbrance by canceling the mortgage. Logan, who held the

title to the equity of redemption on these lots, then conveyed them to the person indicated by Wild, and the property passed under the control of Wild; so that Wild had received pay for his judgment by advising Mrs. Voss to cancel her mortgage upon the property which he got, and by stopping the proceedings for contempt taken in the interest of the infants, whom he really represented.

Lilliston had consented that those who had become sureties for his conduct should be mulcted for his default, while this property should be passed over to his wards' attorney.

By this arrangement, the evidence is conclusive that Wild received this property of Lilliston in full satisfaction of his debt. Instead of entering satisfaction of his judgment, it appears to have been assigned to one Middleton. The advisory master who heard the cause below concluded that the judgment was satisfied in Wild's hand, but that Middleton got a title to such judgment by the assignment just mentioned, because Middleton had surrendered an interest which he then had in these lots.

This interest is alleged to have arisen as follows: At the time when Lilliston was ordered by the court to give the mortgage to Mrs. Voss upon these Halsey street lots, they were subject to a mortgage of $750. Middleton claims to have advanced the money to pay off this mortgage so that Lilliston could give to Mrs. Voss a first mortgage. He claims that he took a deed for the property, which he never recorded, and that after the Voss mortgage was canceled he destroyed his deed, so that the title could be made to Wild's appointee to pay the Wild judgment; that he was to be repaid for his destruction of this deed by an assignment of the judgment.

There is great difficulty in arriving at the truth of this claim. It seems that the title to these Halsey street lots had been put in the name of one Bilyew, a nephew of Mrs. Lilliston. Bilyew made the deed to Lilliston on December 28th, 1874, and Lilliston made the mortgage to Mrs. Voss December 30th, 1874. Middleton intimates in his testimony that Bilyew made him a deed at the time of the loan of the $750, and it was before the Voss mortgage was given.

It is difficult to conceive why a deed should have been made to him at that time, or indeed at any time, to secure the loan. Middleton knew the purpose of the loan, which was to clear the property so as to permit the making of the Voss mortgage by Lilliston. He knew that the property was worth less than the amount of the Voss mortgage. A deed taken by him, either before or after the making of the Voss mortgage, would be of no value as security. If taken before, his title would be subjected to the lien of the mortgage, of which he was cognizant, while of his title the mortgagee was not apprised; if taken after, he got no title, because it was already in Lilliston, who conveyed to Logan. And the fact that Lilliston, after giving the Voss mortgage, conveyed the property to Logan, who recorded his deed and held the title until called upon to reconvey to Wild's appointee, is a curious feature in this transaction, if it be assumed that Middleton had already a title to the same property. In any aspect of the case, when it is so clear that the mortgage would not have been satisfied unless upon the understanding that Wild should obtain the property—and it also appears that Middleton's interest in it, while mortgaged, was worthless—I do not see how it can be said that he surrendered any valuable interest in the property at the time of the assignment of the judgment.

If we assume, however, that Middleton was a creditor of Lilliston, and that as between him and the parties to the judgment an assignment of the judgment might be valid as against Lilliston and subsequent encumbrancers of his property, yet I am convinced that the facts disclosed in the testimony in this case would exclude him from any assistance from a court of equity in enforcing this judgment. The circumstances show convincingly that the primary object of this assignment was to keep the judgment alive as a shield against the claims of other creditors of Lilliston. It seems obvious that Middleton did not wish the assignment as a security for any indebtedness of Lilliston, nor did he intend to use it for the collection of any such debt. The relations between him and Lilliston, both before and after the assignment, were entirely confidential. Lilliston says that he used Middleton, among others, as the repositary of the titles of the properties which he owned, because

18

he had so many suits and judgments against him that he could not hold any property in his own name. He was in as strong a position to secure his debt without as with this judgment. And his conduct after the assignment fortifies this view. He knew—for he says that Lilliston told him—that he (Lilliston) had lands in his wife's, his stepdaughter's, and his sister's names. About the time of the assignment—although the exact date does not appear—Middleton had in his name the title of the Tompkins avenue property, and although he says he was then a creditor of Lilliston, he permitted Lilliston to collect the rent.

From the time of the assignment, in the spring of 1876, down to 1882, he took no steps to collect the judgment. At the end of that time he filed a bill in the city court of Brooklyn to reach some property, which he charged had been put in the name of a third person by Lilliston, in fraud of his creditors. But it is obvious that Lilliston was himself behind the complainant in that suit. The cause of the litigation grew out of Lilliston's troubles with his wife. She had ceased to live with him early in 1881. She filed a bill in July, 1882, and in August, 1884, got a decree of divorce from him on the ground of adultery. This condition of affairs between himself and wife led to this suit.

When their relations became such that he lost control over the property which, under the use of her name, he had been concealing from his creditors, he cast about for some means of reaching it. He resorted to the use of this judgment as a method of accomplishing by indirection what he could not do directly. From all the testimony, I am satisfied that the statement of Logan, who had been an attorney for Lilliston, relative to the assignment of the judgment, is substantially accurate. His statement is this, namely: "When the judgment was satisfied, it was deemed best not to satisfy it on the record ; and Lilliston gave me the name of Middleton, and said that Middleton was sheriff or deputy-sheriff, and that Middleton, being in the sheriff's office, could be of service to him, and that instead of being satisfied of record, it should be assigned to Middleton." Mr. Logan then proceeds to state how the judgment in Middleton's hands could be of service to Lilliston. It would be a first lien on all

his property, held by a friend, and besides, by the custom of the sheriff's office, as Middleton, who was deputy-sheriff, would hold the first execution, all other executions against Lilliston would go into the hands of the same deputy. So I am forced to the conclusion that the assignment was one of the devices resorted to by Lilliston to baffle his creditors, and that Middleton stood as assignee of this judgment, as he had stood as grantee of many conveyances in the posture of an abettor of Lilliston's design. He would have no standing in a court of equity as a suitor asking its assistance in collecting this judgment. Besides, I am satisfied that these suits were brought in the interest of Lilliston to enable him to reach property which he had fraudulently concealed. In this the court will not lend its aid. *Ruckman* v. *Conover, 10 Stew. Eq. 583.*

It is true that the present suit is brought by Mr. Graves, an assignee of Middleton, instead of Middleton himself. The assignment is said to have been made in payment for professional services rendered to Middleton by Graves, who is a lawyer. But I think it clear he occupies no better position than his assignor. Nor is it necessary to put this conclusion upon the ground that an assignee takes a judgment subject to all the defences against it while in the hands of the assignor, and that the fraud which tainted this judgment was of that kind which an assignment in good faith and for value does not purge.

I think it not necessary to decide how far his rights would permit him to press this claim if he occupied a different position, because of the fact that Mr. Graves has been concerned, more or less, in the transactions out of which the assignment of this judgment sprang, from the beginning. He was Middleton's attorney for a number of years. In 1876 he was Lilliston's attorney in respect to the proceedings against Lilliston to collect the amount he owed the Wardell infants. Out of this proceeding came the order to give the Voss mortgage, and subsequently the payment of and assignment of the Wild judgment. He knew of Lilliston's habit of concealing his property, for he speaks of such a practice existing as early as 1874. He brought the suit in Middleton's name, in the Brooklyn city court, in 1882,

·and it was during the progress of that suit that Middleton became tired of the litigation, he says, and assigned the matter to Mr. Graves.

While Mr. Graves is not chargeable with any active participation in the original assignment or its purpose, yet his close connection with all these and the subsequent proceedings relative to it must have apprised him of the character of the transaction long before the date of the assignment to him.

He is chargeable with notice of the design for which the judgment was kept alive, and took it burdened with Middleton's inability to invoke the aid of a court of equity to enforce it.

I am further of the opinion that Sarah E. Winans is a *bona fide* purchaser for value. I think it is probable that her grantors, immediate and remote from Mrs. Lilliston, knew, at the time when each acquired her title, of the design of concealment, and so each took the title with notice of that purpose. But the conclusion that Mrs. Winans occupies the position of a *bona fide* purchaser for value defeats the claim of the complainant under the bill filed in this cause. · It is filed for the cancellation of the conveyance to her, which cannot be decreed except upon the assumption that she took the title with notice or without paying any consideration.

Under a bill drawn for that purpose it would be proper to charge upon the property the amount found by the advisory master to be due upon the judgment, as the difference between the amount paid by Mrs. Winans and the value of the property is equal to the sum so found due. Mrs. Winans would be protected only up to the amount of the consideration paid by her. *Muirhead* v. *Smith, 8 Stew. Eq. 303.*

I am speaking of that aspect of the case, aside from the fraudulent character of the assignment of the judgment already discussed. I remark again that upon a proper issue the charge upon Mrs. Winans's property might have been made. And this court will sometimes direct the amendments to be here made. But there is another obstacle in the way of reaching this result. It lies in a defect of parties to the suit. Miss Dewing, who sold to Mrs. Winans, is not made a defendant. She would not be bound by

a decree based upon her fraudulent act in selling the land to Mrs. Winans. She would therefore, notwithstanding the land had been charged with Graves's claim, have her action against Mrs. Winans for the unpaid part of the purchase-money. The question of Miss Dewing's fraud would then have to be tried *de novo*, with possibly a different result. In such an action Miss Dewing, while not estopped by the decree in this cause, would be prejudiced by its existence. The effect of an absence of necessary parties, when the objection is raised for the first time at the final hearing, rests very much in the discretion of the court, to be exercised in view of the effect of the decree upon the rights of the omitted parties and of the value of the decree to the complainant. *Wood* v. *Stover, 1 Stew. Eq. 248.*

The court will also consider the character and importance of the suit, as well as the time consumed in its prosecution.

In this case, if there existed doubts as to the character of the assignment upon which the complainant stands, I should yet regard the absence of Miss Dewing as a party defendant as a serious objection to the decree in this cause.

The decree should be reversed.

*Decree unanimously reversed.*