I will dispose of this matter now. I have allowed the fullest latitude in the trial of this cause, because I thought it best to have a complete record of the whole transaction, so that there will be no question hereafter as to the basis of this decision.
This bill seeks the specific performance of a contract for the sale of land, entered into between the defendant Rynda Development Company as vendor and Chemtec Company as vendee. The complainant Amalia R. Gluck is the assignee of the Chemtec Company. The complainant Maurice B. Gluck is her husband, and, I believe, the real party in interest. The agreement was dated May 1st, 1922, and provided for the sale and purchase of a lot of land sixty feet in front by one hundred and forty feet in depth, located at South Orange, New Jersey, known and designated as lot 31 on map of Rynda Development Company. The purchase price of the lot was $2,340, of which $160 in cash was paid on the date of the agreement and the contract provided for the payment of $780 in cash on the day of settlement and the balance of $1,400 by the execution and delivery to the Rynda Development Company of a mortgage, payable one-third in one year and the balance at the end of the second year, together with interest at six per cent., and which mortgage was to be subject to a proposed first mortgage in an amount not exceeding eighty per cent. of the cost of a house to be erected on the lot. It was stipulated in the agreement that the purchaser was to be let into possession for the purpose of constructing a dwelling. The date fixed for final settlement under the contract was August 1st, 1922, but the *Page 790 
date of settlement was continued from time to time until some time in December, 1922. The exact date to which it was continued is a little uncertain, as neither party agrees to the particular date on which settlement was to be finally had, but as I look at this case it does not make much difference whether it was December 21st or December 26th.
The complainant Maurice B. Gluck was the president of Chemtec Company, the vendee under the agreement of sale. The Chemtec Company entered into possession and began the construction of a building, but became financially involved; mechanics' lien suits were instituted and prosecuted to final judgment, and the defendant Arlington Realty Company became the purchaser of the property at sheriff's sale held under an execution issued on the mechanics' lien judgment, and received a deed from the sheriff of Essex county. The complainants allege tender of performance by them and refusal of the defendant Rynda Development Company to perform. Complainants also allege the delivery of a deed by the defendant Rynda Development Company to them, redelivery by the complainants to this defendant and unlawful retention of that deed by this defendant. Some phases of this controversy have already been before this court in at least two suits in which three opinions were filed by Vice-Chancellor Backes. The files in these cases have been produced here in court to-day and are, respectively, docket 54, page 565, and docket 56, page 535, and some phase of this matter has also been before the Essex county circuit court in various mechanics' lien suits, and in particular one brought by the complainant Maurice B. Gluck against the complainant Amelia R. Gluck, the defendant Rynda Development Company and others, and which suit was dismissed by Judge Dungan for failure to prosecute within the year. This judgment was affirmed by the court of errors and appeals on Judge Dungan's opinion in May of last year, and the report of that case will be found in 3 N.J. Adv. R. 997.
The purchase price stipulated in the agreement was never paid by the vendee or its assignee. The only payments on account of the purchase price shown to have been made are *Page 791 
the payment of $160 on the execution of the contract and the payment of $400 by the Chemtec Company by virtue of an assignment of certain other contracts by that company to the defendant Rynda Development Company, and for which this defendant gave the Chemtec Company a credit of that amount. Complainant Gluck contends that the $1,400 mortgage referred to was executed and tendered with the purchase price of $780 in cash, and that that tender was made to the Rynda Development Company on or about November 25th. This is denied by the Rynda Development Company's officers. I find as a fact that no such tender was ever made. The reasons for my finding against Mr. Gluck on this point will appear later.
Some time in November, 1922, the complainants had arranged for a loan from the defendant Franklin Society for Home Building and Savings, with the proceeds of which it was intended to complete the purchase of the lot in question and also to complete the buildings. In order to facilitate the consummation of this loan and the settlement, the defendant Rynda Development Company delivered to the defendant Hennessey, in escrow, a deed for the lot in question, duly executed by the Rynda Development Company, which was to have been delivered to the complainant Amalia R. Gluck only upon completion of the whole transaction and the payment of the balance of the purchase price according to the terms of the agreement. By subterfuge, the complainant Maurice B. Gluck obtained possession of this deed from a representative of the defendant Rynda Development Company, to whom it was entrusted for delivery to Mr. Hennessey, had a photostatic copy thereof made and then returned the deed to this representative or induced the representative to have a copy made himself; but in the view I take of the matter, it does not make any difference, in the legal effect, which of these statements is true. Some time thereafter the complainants executed to one Frieda Horn, a sister of Mr. Gluck, a mortgage on the premises in question for $850, and attached this photostatic copy of the deed to the mortgage and recorded the mortgage with the copy of the deed attached in the office of the Essex county register of *Page 792 
deeds. And prior to this, Mr. Gluck had attempted to have the photostatic copy recorded as a deed, but this was refused by the register of deeds and Gluck left the register's office vowing that he would get the copy of the deed on record in spite of such refusal. The arrangement with the defendant Franklin company, whereby the complainant Amelia R. Gluck was to obtain a loan from that company, was never consummated, and the deed which had been delivered to Mr. Hennessey, in escrow, was returned to the Rynda Development company and destroyed. The mechanics' lien suit and sheriff's sale, at which the defendant Arlington Realty Company became the purchaser, followed. The Arlington Realty Company entered into possession of the premises over the protest of Mrs. Gluck, completed the building and thereafter executed a mortgage for $8,000 to the defendant Dime Savings Institution. The Arlington company then filed its bill to quiet title to the land. This bill was dismissed when it appeared at the trial that the complainant was not in peaceable possession, its possession being disputed by Mrs. Gluck, and actual peaceable possession being the jurisdictional requirement of the statute. It was held in that suit, however, that the deed, photostatic copy of which was made and recorded by the complainant Maurice B. Gluck, was never delivered, and that the copy was a fraud. The bill was dismissed without prejudice, with leave to the complainants to present a properly drawn bill charging that the Glucks claimed title under the deed, the photostatic copy of which was on record, and that that record constituted a cloud on the title, and praying that the original and photostatic copy of the deed be declared null and void, and indicating that under such circumstances relief would be granted. Subsequently, the Arlington Realty Company did file such a bill, but it also was dismissed, because in that suit it was shown from the record of the mechanics' lien suit that the issuing of the summons was not endorsed on the lien claim as the statute requires, and, consequently, the lien was discharged; and as the judgment was, therefore, a nullity, no title passed by the sheriff's deed. In that suit Vice-Chancellor Backes, in reciting the facts found by him, said: *Page 793 
"In the meanwhile the Chemtec Company transferred its contract to Amalia R. Gluck and the Rynda Development Company arranged to convey the land to her. Mrs. Gluck negotiated with a New York concern for a mortgage; the time was fixed for the passing of the title at the office of the lender's attorney in New York, and the deed was left with the attorney to be delivered on payment of the balance of the purchase-money. The mortgage loan was not affected, the purchase price was not paid, and the deed was surrendered by the attorney to the Rynda company. Before delivering the deed to the New York attorney, Maurice B. Gluck, Mrs. Gluck's husband, a New York lawyer, who represented her in all the transactions, persuaded the representative of the Rynda company to permit him to have a photostatic copy of it made, upon the representation that it would be a protection against the New York attorney. Gluck then had his wife execute a mortgage to one Frieda Horn and annexed to it the photostatic copy of the deed and recorded it in the Essex county clerk's office. The Glucks made the claim that the deed was delivered, but that is false."
Following this decision the Rynda Development Company conveyed all of its interest in the lot in question to the Arlington Realty Company, by deed dated October 29th, 1925, and acknowledged December 2d 1925, and recorded on December 7th, 1925. It also now appears that the Arlington company, on January 15th, 1924, received another deed for that property from the sheriff of Essex county under another mechanics' lien judgment. This deed was not recorded until March 11th, 1926. No reason is assigned for the delay in recording this deed. The validity of this deed is now attacked by the complainants because of alleged defects in that mechanics' lien proceeding. It is unnecessary, however, to decide this question now in the view I take of the matter, and also because the Arlington company now has a deed from the Rynda Development Company, in which company rested the legal title if the sheriff's deed did not convey it. Complainants have made defendants in this action the Rynda *Page 794 
Development Company, because of its contract; Abraham Hauptman, Jacob Hauptman and J. Lewis Fiacre, who are officers of that company, on the theory that they were conspiring to deprive Mrs. Gluck of her deed; the Arlington Realty Company, because of its record title, and the Dime Savings Institution, on the theory that its mortgage was taken with notice of the complainants' claims, and is, therefore, subject thereto. The Rynda company, while admitting the agreement and possession of Chemtec Company for a time and partial completion of the building, denied the tender of complainants to perform, denied delivery of the deed and alleged complainants' complete failure to comply with the terms of the agreement of sale. The defendant Arlington Realty Company denies all the material allegations of complainants' bill so far as applied to that defendant and filed a counter-claim against the complainants alleging that the complainants obtained possession of the deed from the Rynda company by fraud, had a photostatic copy thereof made, which was annexed to the Frieda Horn mortgage and recorded, and that this mortgage was without consideration and void, and that the mortgage and deed constituted a cloud on this defendant's title, and asks that they both be declared null and void and canceled on the record. Issue on this counter-claim is joined by both the complainants and Frieda Horn. The defendant Dime Savings Institution denies all knowledge of the equities between the complainants and other parties and claims priority on its $8,000 mortgage. Defendants Franklin society and Hennessey deny all pertinent allegations of the bill except that they admit the agreement for the mortgage loan, but allege failure of complainants to comply with the terms of this agreement and laches.
By reference to the opinion of Vice-Chancellor Backes in the two chancery suits above referred to, it will be seen that it has already been judicially found that the deed from the Rynda company to Mrs. Gluck, which was delivered to Mr. Hennessey in escrow, was fraudulently obtained by Mr. Gluck, and that the claim of Mr. Gluck that this deed was *Page 795 
delivered is false. This part of the controversy is thereforeres adjudicata. Mrs. Gluck obtained no rights in the premises by the recording of the photostatic copy of that deed; nor did Frieda Horn, Mrs. Gluck's mortgagee, obtain any rights in this property by virtue of her mortgage, which are superior to the rights of the defendants. Whatever rights she had must be derived from the Glucks themselves and can rise no higher than their source.
After issue was joined in this suit the complainant served interrogatories on three of the defendants so voluminous in character as to immediately raise the question as to their propriety. On motion to strike out the interrogatories, which were two hundred and eighty-seven in number, the matter was referred to a master of this court to examine and report to the court which of the interrogatories, if any, should be stricken out. As a result of the master's report, all of the interrogatories were stricken out with leave to the complainants to reframe them, the reframed interrogatories to include only certain interrogatories specifically mentioned by the master as of probable pertinence.
This bill was filed on December 15th, 1925. At that time the premises in question were occupied by a tenant of the Arlington Realty Company, although the right to possession of the Arlington Realty Company was disputed by the complainants. This tenancy arose by virtue of a contract of sale between the Arlington Realty Company and the tenant. Because of representations of Mr. Gluck to this tenant, the vendee under that agreement of sale, she defaulted in her payments thereunder. She suffered herself to become in default because Mr. Gluck claimed that he was the real owner of the property. Subsequently, after default, the tenant was ousted from the premises at the suit of the Arlington Realty Company because of non-payment of rent under the agreement. On the vacation of the premises by this tenant, she was interviewed by the complainant Maurice B. Gluck, who represented to her, in effect, that the Arlington Realty Company had neither right nor title to the premises. This representation was made either to Mrs. Smith, *Page 796 
the tenant, or to her attorney, I am not just clear which, but the effect is just the same. He also represented that Mrs. Gluck was the rightful owner and was entitled to possession; and later, as a result of that conversation, and on the advice of complainants' solicitor, they obtained the keys to the building and themselves moved into it and are now in possession. Immediately after possession was thus taken by these complainants, the Arlington Realty Company filed a petition in this cause reciting these facts and praying for a mandatory injunction removing the complainants from possession of the premises. An order to show cause was issued on this petition, and on its return answering affidavits were filed by the complainants and their counsel. The complainants then moved to strike out this petition — first, on the ground that possession was a matter of legal right, and that this court had no jurisdiction to determine the legal right to possession, and second, on the ground that the petition showed no right to equitable relief. The disposal of this order was held pending final hearing of the cause. The affidavits of the complainants and their counsel submitted on the return of this order, and the testimony of the complainant Maurice B. Gluck at this hearing, but confirm the allegations of the petition.
It appears to me from the evidence submitted in this cause that complainants were hopelessly in default under their contract of purchase, and that there is not now presented to this court a situation which would justify a decree for specific performance; but irrespective of whether or not under the evidence the vendor or the vendee is in default, and irrespective of the rights of complainants to specific performance, there are other circumstances in this suit respecting the conduct of the parties which effectually preclude the complainants from any relief in this tribunal. The complainants have sought relief in a court of equity. A court of equity is a court of conscience. The conscience of the applicant for relief in this court is always open to the scrutiny of the chancellor. One of the most wholesome and beneficent principles of a court of equity finds voice in the *Page 797 
maxim that "he who comes into equity must come with clean hands," and this maxim means that, not only must one seeking equitable relief enter the portals of this court with clean hands, but he must keep them clean after his entry and until the final determination of the issue.
While both the complainant Mr. Gluck, who is an attorney of the New York bar, and his counsel here should be perfectly familiar with the elementary maxim to which I have referred, and with its application in a court of conscience, it is apparent that they are not as familiar as their calling would lead one to presume.
Mr. Tansey — I object to your honor's statement.
Court — I don't care if you do. It does not make any difference. You had complete knowledge of this whole affair, and on your own statement here in court to-day, you, at least, advised and connived with Mr. Gluck to obtain these keys from Mr. Smith. I will not brook any interruption from you now. In view of this situation, I think it is quite appropriate, not only for the enlightenment of the complainant, but for the enlightenment of his counsel as well, that I should advert to certain judicial pronouncements and comments of eminent writers on equitable jurisprudence in the discussion and application of this fundamental principle. These authorities I took occasion to examine in connection with the order to show cause for a mandatory injunction already referred to, and noted them for use at this trial, and this portion of my conclusions, I may say, while orally delivered, is very much like the famous "extemporaneous" reply of Webster to Hayne, in that it was prepared in advance, and, in commenting on the law applicable to this case, I do so only after due consideration. I have carefully examined the complete file in this case and read with extreme interest the voluminous affidavits submitted by all parties. The facts which developed at the hearing to-day are not materially different from those appearing from an analysis of the pleadings and affidavits.
This doctrine of clean hands is of ancient origin (Bentley v.Tibbals, 223 Fed. Rep. 247) and broad application. 21 Corp.Jur. 182. *Page 798 
In Deweese v. Reinhard, 165 U.S. 386 (41 Lawyers' ed.757), Mr. Justice Brewer said:
"A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity."
In Eaton Eq. 74, it is said:
"Equity will refuse its aid in the enforcement of a contract where the plaintiff has practiced fraud on the defendant, and also where the plaintiff has been guilty of any unconscionable conduct which does not amount to legal fraud."
In Pom. Eq. Jur. § 398, it is said:
"Whatever may be the strictly accurate theory concerning the nature of equitable interference, the principle was established from the earliest days, that while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act upon the conscience of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies. This fundamental principle is expressed in the maxim `He who comes into a court of equity must come with clean hands.'"
And further, in § 404:
"It is not alone fraud or illegality which will prevent a suitor from entering a court of equity; any really unconscientious conduct, connected with the controversy to which he is a party, will repel him from the forum whose very foundation is good conscience."
In Primeau v. Granfield, 193 Fed. Rep. 911, 913 (56Lawyers' ed. 1267), the court said, in discussing the application of this maxim: *Page 799 
"The court must consider it, not because it is a matter of defense to the defendant, but because it is against public policy to hear the case if the charge be established. The court acts for its own protection rather than for the protection of the defendant. When fraud or illegality is disclosed in a case public policy requires a court to refuse its aid irrespective of the state of the pleadings and regardless of the fact that with fraud and illegality absent the plaintiff might appear entitled to relief."
In Houtz v. Hellman, 228 Mo. 655, 671; 128 S.W. Rep. 1001,
the court said:
"The maxim is enforced by the chancellor ex mero motu, and because of public policy, when the facts call it into use, though the disclosures are made at the trial as happened in this case. Sometimes it is applied where both plaintiff and defendant have knowingly made a contract tainted with illegality; sometimes it is applied where only the party seeking to enforce is in fault; but it proceeds always on the theory that the dignity of the court is touched to the quick, and that courts of equity will not countenance inequity."
In Commonwealth v. Filiatreau, 161 Ky. 434;170 S.W. Rep. 1182, it was held that —
"The maxim is broad enough to demand that he who prays from the chancellor protection, as well as he who seeks affirmative aid, must openly and frankly, without reservation or evasion, yield to the chancellor that full measure of confidence and truth which is prerequisite to the assertion and exercise of chancery powers, and the lack of which must necessarily repel him from a forum whose very foundation is mutual confidence and good faith."
In Bearin v. Dux Oil Co., 166 Pac. Rep. 199, application was made for a temporary injunction, and the complainant falsely alleged that it was in possession of the premises involved in the suit to obtain the process of the court to enable it to regain possession. The supreme court of Oklahoma, on appeal, held that the complainant had not come into equity with clean hands and was not entitled to any *Page 800 
relief, citing, among other cases, Michigan Pipe Co. v.Fremont, 111 Fed. Rep. 284, in which case Judge Sanborn said:
"A suit in equity is an appeal for relief to the moral sense of the chancellor. A court of equity is the forum of conscience. Nothing but good faith, the obligations of duty and reasonable diligence, will move it to action. Its decree is the exercise of discretion, not of an arbitrary and fickle will, but of a wise judicial discretion, controlled and guided by the established rules and principles of equity jurisprudence. One of the most salutary of these principles is expressed by the maxims, `he who comes into a court of equity must come with clean hands,' and `he who has done iniquity cannot have equity.' A court of equity will leave to his remedy at law — will refuse to interfere to grant relief to — one who, in the matter or transaction concerning which he seeks its aid, has been wanting in good faith, honesty or righteous dealing. While in a proper case it acts upon the conscience of the defendant, to compel him to do that which is just and right, it repels from its precincts remediless the complainant, who has been guilty of bad faith, fraud or any unconscionable act in the transaction which forms the basis of his suit."
In Little v. Cunningham, 92 S.W. Rep. (Missouri Appeals)734, a bill was filed for an injunction enjoining the defendants from maintaining a call bell and private telephone in connection with the main line of an unincorporated, voluntary association owning a small telephone line for mutual convenience in Knox county, and the court held that complainants were entitled to relief. Before decree, complainants removed the offending telephone without authority from anyone. Notwithstanding this the court granted a decree which would give the right to the complainants to do the thing which they had in fact done. Appeal was taken. The appellate court, notwithstanding the complainants were entitled to relief which they asked in their bill, reversed the decree below and dissolved the injunction, because of the conduct of the complainants in removing the telephone before decree. In passing on the issues involved in that case, the court said: *Page 801 
"Notwithstanding the conclusive showing that the plaintiffs had thus proceeded vi et armis to administer for themselves a portion, at least, of the relief for which they pray in the bill, the court decreed a perpetual injunction.
"Indeed, it is true that the plaintiffs in error were the first wrong-doers, but the doctrine that a prior wrong on the part of one will justify a subsequent wrong on the part of the other certainly can have no countenance in a court of equity where the principles that `he who seeks equity must do equity' and `he who seeks equity must come with clean hands' guide and direct the chancellor. It is manifest from the record that the cause of the defendant in error became polluted during the pendency of the suit with the same character of wrongful conduct toward the rights of the plaintiffs in error as had the cause of the plaintiffs in error been polluted by the prior misconduct on their part, and the cause of the defendants in error having thus become soiled by their own iniquity, they could have no equity.
"One of the ancient and familiar maxims of equity jurisprudence is that `he who comes into equity must come with clean hands.' The maxim has been otherwise stated, `who does inequity shall not have equity.' * * * They must come with clean hands, with a conscionable regard for the rights of others, ready to do equity on their part and seeking only equity at the hands of the court. * * * And in discussing the salutary principle, it is said: `Generally, when a party seeking the intervention of equity has been attempting to secure his ends by means resembling those which he seeks to enjoin he will be denied relief. * * * The principles of equity, identical with the principles of justice and truth as they are, are applied by a court of conscience on the status of the case and the parties as they are revealed at the time the relief is administered by decree, rather than at the date of the institution of the suit, inasmuch as by virtue of these wholesome principles arise the conditions which are imposed by the court' as the price of the decree it gives; and if unfavorable circumstances have arisen by the wrongful *Page 802 
conduct of the parties during the pendency of the suit, the court will take such circumstances into account at the final reckoning. * * * It is palpable that the defendants in error, by their unwarranted intrusion in cutting the wire and thus cutting the plaintiffs in error from the main telephone line during the pendency of the suit and thus assuming to themselves by force of arms the relief which they had prayed the court by their bill to grant, place themselves as much beyond the pale of conscionable conduct as had plaintiffs in error by their acts complained of in the bill."
In Hartan v. McKee, 73 Fed. Rep. 556, relief was denied because the plaintiff for the purposes of the case had changed the date of certain letters, although on the facts he would have been entitled to relief if his hands had been clean.
In the English case of Collins v. Blantern, 2 Wils. C.B.347; 95 Reprint 850, the court said: "All writers upon our law agree in this, no polluted hand shall touch the pure fountain of justice, and those so entering the temple will be expelled with the anathema, `Procul, O, Procul este profani.'"
An adverse claimant of land who purchases a lease or procures a tenant to attorn to him gains no rights in equity by the possession so obtained. Latham v. Northern Pacific Realty Co.,45 Fed. Rep. 721; Stetson v. Cook, 39 Mich. 750.
In the case at bar, it will be noted that the complainants have obtained possession of the premises involved in this suit by fraudulently procuring what amounts to attornment by the tenant; namely, the delivering up of the keys. The unconscionable character of the transaction between the parties need not be pleaded by the defendant. Whenever it is disclosed the court will, of its own motion, apply the maxim and it does not matter at what stage of the proof or in what order a lack of clean hands is discovered. 21 Corp. Jur. 186.
But the authorities on the doctrine of unclean hands are not, by any means, confined to foreign jurisdictions. This principle has been repeatedly expounded and applied in this court and its exposition and application repeatedly affirmed by our court of errors and appeals. Examples of its application *Page 803 
will be found in Cutler v. Tuttle, 19 N.J. Eq. 549; Johns v.Norris, 22 N.J. Eq. 102; Watson v. Murray, 23 N.J. Eq. 257;Ellicott v. Chamberlain, 38 N.J. Eq. 604; Winans v. Graves,43 N.J. Eq. 263; Brook v. Cooper, 50 N.J. Eq. 761; Hildebrand
v. Willig, 64 N.J. Eq. 249; Vulcan Detinning Co. v. AmericanCan Co., 70 N.J. Eq. 588; reversed, but not on principle, in72 N.J. Eq. 387; Pendleton v. Gondolf, 85 N.J. Eq. 308, where Vice-Chancellor Leaming reviewed a number of cases (Prindeville
v. Johnson, 93 N.J. Eq. 425; Neubeck v. Neubeck, 94 N.J. Eq. 167), and see the later case of Clickner v. Clickner, 95 N.J. Eq. 479,
where Vice-Chancellor Buchanan denied relief to a petitioner for annulment on the ground that he had, by his testimony, been guilty of an attempt to fraudulently impose upon the court.
Measured by the standard of these eminent authorities the complainants' conduct falls far short of equitable requirements warranting the exercise of the extraordinary powers of this court in their behalf. It is baldly apparent that not only did the complainants not come into this court with clean hands, but they have not kept them unsoiled since their entry. They were guilty of fraud and unconscionable conduct in connection with this particular transaction when they induced Mr. Hauptman, the representative of the defendant Rynda Development Company, to have a photostatic copy of the deed, which was in his possession, made, and then obtained the photostatic copy and attached it to the mortgage and then had both recorded. This deed was obtained by trickery and stealth, by false pretences, which is nothing more nor less than a form of stealing. I say "they" because Mr. Gluck was either the real party in interest, as claimed by the defendant, or his wife's agent, acting with her full knowledge and authority. Mr. Hauptman had no idea of their intention in obtaining the deed or he would not have permitted a photostatic copy of it to have been made. He acted in good faith, but they did not. The subsequent execution of the mortgage and the recording of it and the photostatic copy of the deed together, indicates an attempt by the *Page 804 
complainants to arbitrarily appropriate to themselves rights to which they could not be entitled except upon complainants' complete performance of the terms of the contract. This conduct has already been twice stamped as fraudulent by this court and as already indicated is res adjudicata. Having, in effect, stolen the deed, they then attempt to steal the property represented by it, through the medium of the recording acts. Knowing that the register of deeds would not accept a photostatic copy of the deed itself for record, they resort to the scheme of executing a mortgage and attached this copy of the deed to it for purposes of reference, and in this way procured the deed to be recorded. In view of this situation, it is perfectly plain to me that complainants' hands were not clean when this bill was filed, nor have they kept them clean since coming into court. As incidental to the relief for which they have prayed, one of the rights which it was their purpose to obtain was the right to the possession of the premises in controversy. Notwithstanding the fact that they sought these rights in a court of conscience, they have, as was said in Little v. Cunningham, supra, "proceeded vi et armis
to administer for themselves a portion at least of the relief for which they pray in the bill."
It is apparent that the complainants had little faith that this court would award to them the full measure of relief to which they claim they were entitled, and their conduct in attempting to appropriate to themselves by force and arms rights which they claimed and which were, incidentally, here in controversy, is unconscionable. Their hands are now not only not clean, they are dripping with filth and slime, and I denounce their conduct as bordering on rascality and as repellent to every sense of righteousness and fair dealing.
As to Mr. Gluck, himself, I do not consider him worthy of belief. While he is an attorney of the New York bar, he boasts of the fact that he has on numerous occasions been suspended by the New York courts, and has been at least once jailed for contempt. His conduct here on the stand to-day would justify his commitment, and if I had been *Page 805 
less charitably inclined, he would have been committed this morning.
The complainants claim, however, that this court has no jurisdiction to remedy the wrong thus imposed on the defendant Arlington Realty Company, because, as they claim, the right to possession is a legal right, enforceable only in a court of law, because it involves a right of title; and while this theory, as a general proposition, may be true, it is unconscionable for the complainants to now attempt to assert it. If this contention is correct, then my conception of the principles lying at the foundation of this court's jurisdiction is a completely mistaken one. It is unheard of that this court cannot maintain the statusquo during the pendency of any suit properly before it. Such an assertion is a denial of the right to the issuance of preliminary injunctions, a right freely exercised in this tribunal. The complainants themselves have sought relief in this court and thereby submitted themselves and this controversy in all its phases to the jurisdiction of this court, and it does not lie in their mouths to deny the court's right to dispense justice to all the parties involved. It should be borne in mind that the remedy by specific performance in this court is discretionary. The question is not, what must the court do, but what, in view of all the circumstances of the case in judgment, should the court do to further justice. Plumer v. Keppler, 24 N.J. Eq. 481.
For the reasons above stated the complainants' bill will be dismissed, with costs. The prayer of the counter-claim of Arlington Realty Company will be allowed and the complainants and Frieda Horn will be directed to deliver up and surrender for cancellation the mortgage and photostatic copy of the deed which have been recorded, and they will be declared null and void. I will also advise a decree directing that the complainants forthwith vacate the premises in question, and, in the event of their failure to comply therewith, a writ of assistance may issue as in foreclosure cases. If the complainants have any rights at all they may pursue their remedies at law, but under the circumstances *Page 806 
the discretionary powers of this court will not be exercised in their behalf. The motion of the complainant to strike out the petition of Arlington Realty Company will, of course, be denied. I will hear counsel on the question of the form of the decree and counsel fee next Tuesday.
Mr. Tansey — Will you grant a stay?
Court — I will grant no stay whatever with respect to possession of the property.