MCMANUS, Appellant, v. FULTON, Respondent.

(No. 6,377.)

(Submitted January 15, 1929. Decided March 11, 1929. Opinion on Motion for Rehearing filed June 8, 1929.)

[278 Pac. 126.]

172

 

*Mr. Louis P. Donovan* and *Mr. William Scallon,* for Appellant, submitted a brief; *Mr. Donovan* argued the cause orally.

*Messrs. Freeman, Thelan & Freeman, Mr. J. A. McDonough* and *Mr. Art. Jardine,* for Respondent, submitted a brief; *Mr. McDonough* argued the cause orally. *Mr. Henry C. Smith* and *Mr. C. A. Spaulding,* of counsel.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

During the March term, just ended, the judgment of the trial court was reversed by a three to two decision. Two opinions were filed. Considering the case upon motion for a rehearing and as a result of an extensive study of the authorities one of the justices has changed his mind, now being of the opinion that the judgment ought to be affirmed. In coming to this conclusion he but followed the commendable rule of judicial conduct expressed a thousand years ago by Khalif Omar, instructing his first Kadi: "If today thou seest fit to judge differently from yesterday, do not hesitate to follow the truth as thou seest it; for truth is eternal, and it is better to return to the true than to persist in the false."

The plaintiff brought this suit to recover from the defendant the sum of $56,581 for breach of contract. The amended complaint sets forth two causes of action. In the first it is alleged, *inter alia,* that in the month of April, 1925, in the city of Chicago, state of Illinois, the defendant employed the plaintiff to sell on commission certain shares of the capital stock of the Fulton Oil Company, a Montana corporation, and agreed that plaintiff should receive a commission of twenty-five cents a share "for every share sold and paid for by the purchasers at the rate of one dollar ($1.00) per share or over, or take his commission in shares of said stock, the number of shares to be fixed by taking them as of value of

sixty (60) cents per share"; that pursuant to the agreement the plaintiff proceeded to sell the shares of stock placed in his hands for sale and did sell and deliver to purchasers 12,200 shares which were paid for by purchasers at the rate of one dollar per share, and in some cases more, and that all of the money realized from the sale of the shares, at the prices thereof, was transmitted from Chicago to the defendant in Montana; that in May, 1925, the plaintiff elected to take his commission in shares of stock in the Fulton Oil Company, being then entitled pursuant to the terms of the contract to 5,083 shares; that after plaintiff became entitled to the shares the company declared and paid a dividend of one dollar per share; that plaintiff has repeatedly demanded of defendant delivery of the shares, but defendant has not delivered the same, or any part thereof; that the shares at the time of filing the complaint were of the value of $30,498.

In the second cause of action it is alleged, *inter alia,* that in the month of April, 1925, the plaintiff, at the special instance and request of the defendant, "made in the city of Chicago, state of Illinois, rendered services to the said defendant in the said city of Chicago," in connection with negotiating for the sale of stock in the Fulton Oil Company to one McGinley and one Ponting, in consideration whereof the defendant then and there agreed and promised to deliver to the said plaintiff 3,000 shares of the capital stock of the company; that after plaintiff became entitled to the shares, the company declared and paid a dividend of one dollar per share; that demand has been made by plaintiff on defendant to deliver the shares to plaintiff, but defendant has not delivered the same or any part thereof, that at the time of filing the complaint the shares were then of the value of $18,000.

Judgment against defendant for $35,581 on the first cause of action and for $31,000 on the second cause of action is asked.

The defendant, by amended answer, denied that he had made the contracts sued upon, or that plaintiff had rendered any services to the defendant, and averred that the alleged

contracts made the bases of plaintiff's causes of action "are, were and would have been, absolutely void, as contrary to the express provisions of law, contrary to the policy of express law, contrary to good morals and public policy, and absolutely void and unenforceable because any and all such agreements are, were and would have been in absolute violation of the laws of the state of Illinois," and particularly an Act approved June 10, 1919, known as the Illinois Securities Act, a copy of which was attached to and made a part of the amended answer. Defendant then pleaded facts showing that the shares of stock of the Fulton Oil Company are of the character of securities designated as Class D in the Illinois Securities Act, and alleged, *inter alia,* that the value of the stock of the Fulton Oil Company depended entirely upon prospective income within the meaning of the Illinois Securities Act, for the reason that its income was to be derived from the drilling of oil and gas wells on 160 acres of then undeveloped oil land in Toole county, Montana, and the corporation then had no other assets save and except an oil and gas lease on the land; that the Fulton Oil Company never at any time complied with any of the requirements of the Illinois Securities Act which plaintiff at all times well knew; that plaintiff claimed to be a broker engaged in the selling of stocks and securities with his office at Chicago, Illinois; that plaintiff never at any time complied with any of the requirements of the Act; that all the sales of stock made by plaintiff were made in the state of Illinois; that it was unlawful and contrary to the Illinois statute for plaintiff or anyone else to negotiate any sale of any stock of the Fulton Oil Company within that state.

Defendant pleaded want of consideration for the plaintiff's alleged second cause of action, in that the agreement set forth in the plaintiff's complaint contemplated and required the offering for sale and the sale of stock in the Fulton Oil Company as a general course of conduct in violation of the Illinois Securities Act.

Plaintiff replied, admitting that a true copy of the Illinois Securities Act was attached to the amended answer and that

the plaintiff made sales of stock, but denying the other affirmative allegations of the amended answer.

The case came on for trial before the court sitting with a jury.

It appeared from the evidence that W. H. Essex, W. E. Rice and the defendant Fulton were the owners of an oil and gas lease upon 160 acres of land in Toole county, Montana, and that for the purpose of exploring and developing the land for oil and gas in accordance with the lease, they organized, under the laws of Montana, a corporation under the name of Fulton Oil Company, with a capitalization of $200,000, divided into 200,000 shares of the par value of one dollar each. Upon the completion of the corporation, Essex, Rice and defendant assigned the lease to Fulton Oil Company, in consideration of the issuance to them, or to those whom they might designate, of a total of 115,000 shares of the capital stock of the company, for which, in addition to the assignment of such lease, they agreed to pay the company in cash the sum of $30,000, to enable it to proceed with work upon the property. In carrying out the agreement the defendant proceeded to Chicago and in April, 1925, with the aid and assistance of the plaintiff, sold 50,000 shares of stock in the company to McGinley and Ponting at Chicago, for the sum of $30,000. On April 24, 1925, the plaintiff at his office in Chicago, in defendant's presence, dictated the following statement, which was signed by defendant and delivered to plaintiff: (addressed to plaintiff) "We hereby agree to pay you Three Thousand (3,000) shares of the stock of this company for the service you have rendered in negotiations between ourselves, McGinley and Wayne Ponting. Fulton Oil Company, by W. M. Fulton." While the sale to McGinley and Ponting was pending, plaintiff and defendant actively were engaged in selling, or attempting to sell, stock in the company to others in Chicago. It was agreed that plaintiff was to sell 15,000 shares of the stock of the company upon a twenty-five per cent commission. In a letter written by plaintiff to defendant on June 25, 1925, this was referred to as "the proposed sale by you for the accounts

of Essex, Rice and Fulton of ten thousand shares of their personal stock in the Fulton Oil Company, and five thousand shares of treasury stock in said company.'' It seems that the proceeds of the sales were to be remitted to defendant who was to retain plaintiff's commissions subject to plaintiff's orders; plaintiff was privileged to demand the cash or the equivalent amount in stock of the company at sixty cents per share. Plaintiff made sales to his relatives and clients, totaling 12,200 shares, the proceeds of which were all sent to defendant, and plaintiff would have completed the contract and sold the entire 15,000 shares allotted to him, within the time agreed upon, but for the fact that the defendant refused to permit him to sell more of the stock. The commissions claimed by plaintiff, being twenty-five per cent of the money remitted by him to defendant, amounted to $3,060; and plaintiff elected to convert this amount into stock at sixty cents per share, and accordingly demanded of defendant 5,083 shares of the Fulton Oil Company. Other facts are referred to in the remarks of the trial court, and in this opinion. Upon the conclusion of the evidence introduced by the parties, the plaintiff moved for a directed verdict, whereupon the court said:

''The motion of the plaintiff for a directed verdict is denied. I feel, however, that the case as it now stands and at the close of the evidence, presents a question of law that is decisive of the case,—the special defenses set up by the defendant have been sustained by the evidence. The contract as entered into by the parties clearly shows that it was entered into and was to have been performed in the state of Illinois; that under the laws of the state of Illinois it was unlawful for any person or solicitor, agent or broker, to sell stock known as Class 'D' stock within the state of Illinois without complying with the Illinois Securities Act; that that Act was passed by the legislature of Illinois as a police measure for the purpose of protecting the people of the state of Illinois from the sale of certain securities which were recognized by the legislature as being questionable; that Mr.

Fulton and Mr. McManus, at the time they entered into their contract, were both equally guilty of violating the laws of the state of Illinois; that being so, even though Mr. Mc-Manus faithfully carried out his part of the contract, performed services which were of immense value to Mr. Fulton and his associates, he finds himself in a position where the law will not permit him to come into court and offer testimony, which testimony would have to be that they had entered into an illegal contract, which was a criminal act as fixed by the laws of the state of Illinois. The action comes into this court and the defendants have pleaded the Illinois law, they have introduced in evidence the decisions of the court of Illinois, from which I cannot help but come to the conclusion that Mr. McManus was acting as solicitor and agent in selling the Fulton Oil stock in that state and that the contract was illegal from its inception. * * * ''

Judgment followed for the defendant from which plaintiff has appealed.

This is an action at law for the recovery of a money judgment, based upon two express contracts, and the cause was tried upon that theory. No question of a collateral contract is or can be involved. This the pleadings demonstrate conclusively.

The sole question for decision is, upon the pleadings and the law, may the plaintiff maintain this action?

As the trial court found, the contract between plaintiff and defendant was entered into and was to have been performed in the state of Illinois. All the stock sent plaintiff for sale was received by him in Illinois and all sold by him was delivered to purchasers in that state. Admittedly, all the stock sold by plaintiff was of the character denominated Class D by the Illinois Securities Act, hereafter referred to as the "Act." (Laws of Illinois 1919, p. 353; Laws of Illinois 1921, p. 357.) The Act defines Class D stock as that which is of a speculative character and provides in section 9 that no security of that class shall be sold or offered for sale until there shall have been filed in the office of the secretary of state of

Illinois certain statements and documents, which are described in sixteen subdivisions of that section. One of the documents to be filed is a contract (subdivision 14 of section 9): "If the securities be intended to be offered and sold by the issuer [under the Act the Fulton Oil Company is an "issuer"] through solicitors, agents or brokers, an irrevocable contract executed by each such solicitor, agent or broker authorized to offer or sell such securities by or on behalf of the issuer to the effect that the issuer will receive in cash not less than 80% of the proceeds of each sale of the securities without deduction for any commission or expenses, directly or indirectly, and without liability to pay any sum whatsoever as commission or expenses or for services in and about such sale."

Section 29 provides that any solicitor, agent or broker selling or offering to sell any securities in Class D without compliance with the provisions of this Act, shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be punished by a fine of not less than $100 nor more than $5,000 for the first offense, and not less than $1,000 nor more than $10,000 for the second or any subsequent offense, or by imprisonment in the county jail not more than one year, or may be punished by both such fine and imprisonment in the discretion of the court.

Section 36 provides: "It shall be unlawful for any officer, director, solicitor, broker or agent, to sell or offer to sell any securities in Class 'D' in any other manner or form than specifically set forth in the information required to be filed in section 9 of this Act, and any offer or sale upon any other terms or conditions other than that set forth, shall be considered prima facie evidence that such officer, director, trustee, solicitor or agent offered or sold same for the purpose of defrauding the investor to whom such security was offered or sold."

Section 37 provides that every sale and contract of sale made in violation of any of the provisions of this Act shall be void at the election of the purchaser and the seller of the securities so sold and each and every solicitor, agent or broker

of or for such seller, who shall have knowingly performed any act or in any way furthered such sale, shall be jointly and severally liable, upon tender to the seller or in court of the securities sold, to the purchaser for the amount paid, the consideration given, or the value thereof, together with his reasonable attorney's fees in any action brought for such recovery. In the same section it is provided that in any action, civil or criminal, where the seller or issuer relies for his defense upon any exemption, the burden of proof to establish the exemption shall be upon the issuer or seller.

Subdivision 4 of section 37 provides that for the purpose of the Act all persons, solicitors, agents, brokers, officers and directors of the seller who shall sell or offer for sale in violation of the provisions of the Act or who shall in any manner authorize, aid or assist in any unlawful sale or offering for sale, shall be deemed equally guilty and may be tried and punished in the county in which the unlawful sale or offering for sale was made, or in the county in which the securities so sold or offered for sale were delivered or proposed to be delivered.

Neither the Fulton Oil Company nor the plaintiff complied in any degree with the requirements of the Act. As the trial court remarked, plaintiff and defendant when they entered into the contracts were equally guilty of violating the laws of the state of Illinois.

"A contract directly and explicitly prohibited by constitutional statute in unmistakable language is absolutely void. That has never been judicially doubted and is unanimously conceded." (6 R. C. L. 701.)

"A contract expressly prohibited by a valid statute is void. This proposition has no exception, for the law cannot at the same time prohibit a contract and enforce it. The prohibition of the legislature cannot be disregarded by the courts. (*Botkin* v. *Osborne,* 39 Ill. 101; *Wells* v. *People,* 71 Ill. 532; *Board of Education* v. *Arnold,* 112 Ill. 11, 1 N. E. 163; *Penn* v. *Bornman,* 102 Ill. 523; *Cincinnati Mutual Health Assur. Co.* v. *Rosenthal,* 55 Ill. 85, 8 Am. Rep. 626; *Borough of Milford* v. *Milford Water Co.,* 124 Pa. 610, 3 L. R. A. 122, 17 Atl.

185; *Berka* v. *Woodward,* 125 Cal. 119, 73 Am. St. Rep. 31, 45 L. R. A. 420, 57 Pac. 777; *Levinson* v. *Boas,* 150 Cal. 185, 11 Ann. Cas. 661, 12 L. R. A. (n. s.) 575, 88 Pac. 825.)" (*DeKam* v. *City of Streator,* 316 Ill. 123, 146 N. E. 550; *Duck Island H. & F. Club* v. *Edward Gillen Dock, D. & H. Co.,* 330 Ill. 121, 161 N. E. 300.)

But plaintiff's counsel, in an endeavor to escape the force of this principle, stress the fact that section 37 as enacted in 1919 declared every sale and contract of sale made in violation of the provisions of the Act as void, whereas in 1921 the section was amended to read that "every sale and contract of sale made in violation of the provisions of this Act shall be void at the election of the purchaser." This change, they argue, by a process of reasoning which we are not able to follow, relieves the contracts sued upon from the taint of illegality. The provisions that the sale shall be void at the election of the purchaser does not in anywise detract from the criminal character of the prohibited act on part of the seller. It simply gives to the purchaser a right to content himself with his purchase, or to disaffirm it and recover the price paid, as he may elect. Denunciation of the act of selling securities D without complying with the law is not ameliorated in the slightest degree by the privilege given to the purchaser. Illinois simply made plain what otherwise would have been left to construction. (*Blanks* v. *American Southern Trust Co.,* 177 Ark. 832, 9 S. W. (2d) 310.)

Under the law a contract between the seller and the purchaser was voidable at the option of the purchaser; but that has no relation whatever to a contract between the issuer and the agent, solicitor or broker, or between the agents of the issuer; such, in the absence of a compliance with the Act, is wholly void. Sales of Class D stock without complying with the Act are still prohibited, and issuer and broker are subjected to the same severe penalties for violation of the law. (*People* v. *Glassberg,* 326 Ill. 379, 158 N. E. 103.)

The plaintiff, it appears, was a broker maintaining an office in Chicago, but, in a general sense, anyone who offers to sell

or sells securities is a solicitor within the meaning of the Act. See *People* v. *Curtis*, 233 Ill. App. 13, in which the court affirmed the conviction of Curtis, who was fined $2,000 and costs for unlawfully selling and offering to sell Class D securities without compliance with the provisions of the law, and "without the issuer of such securities then and there having first filed in the office of the secretary of state ⁎ ⁎ ⁎ the statements and documents required ⁎ ⁎ ⁎ to be filed."

Where a statute designed for the protection of the public ▮ prescribes a penalty, that penalty is the equivalent of an express prohibition and a contract in violation of its terms is void. (*Levinson* v. *Boas,* supra; *Berka* v. *Woodward,* supra; *Goldsmith* v. *Manufacturers' Liability Ins. Co.,* 132 Md. 283, 103 Atl. 627.) And with respect to such contracts, as the supreme court of Illinois said in *Penn* v. *Bornman,* 102 Ill. 523, "the distinction in some of the old cases between *malum prohibitum* and *malum in se* has long since been exploded, both in this country and England. (*Cannon* v. *Bryce,* 3 Barn. & Ald. 179 (5 Eng. C. L.); *Aubert* v. *Maze,* 2 Bos. & Pul. 371; *Bank of United States* v. *Owens,* 2 Pet. 539 [7 L. Ed. 508].)"

A contract to do an act contrary to the public policy of a ▮ state is void. (*Shaffner* v. *Pinchback,* 133 Ill. 410, 23 Am. St. Rep. 624, 24 N. E. 867; *Lake Fork Drainage District* v. *People,* 138 Ill. 87, 27 N. E. 857; *Bishop* v. *American Preservers' Co.,* 157 Ill. 284, 48 Am. St. Rep. 317, 41 N. E. 765; *Adams* v. *Brennan,* 177 Ill. 194, 69 Am. St. Rep. 222, 42 L. R. A. 718, 52 N. E. 314; *Douthart* v. *Congdon,* 197 Ill. 349, 90 Am. St. Rep. 167, 64 N. E. 348; *DeKam* v. *City of Streator,* supra.)

"Whenever a statute is made for the protection of the public a contract in violation of its provisions is void," said Judge Kerrigan in *Branderburgh* v. *Miley Petroleum Exploration Co.,* 16 Fed. (2d) 933, holding that a contract employing salesmen to sell corporate stock is void, when salesmen are not licensed to sell under the California Securities Act. (And see *Butler* v. *Agnew,* 9 Cal. App. 327, 99 Pac. 395; *McKinlay* v. *Javan Mines Co.,* 42 Idaho, 770, 248 Pac. 473.)

Speaking of this Act, the supreme court of Illinois said: "The clearly indicated purpose of the legislature was to protect the public from deceit and prevent fraud in the sale and disposition of stocks, bonds and other securities within the state. The authority of the legislature to adopt a statute of this character is found in the police power, for the promotion of the general welfare by the prevention of frauds. * * * This Securities Law is aimed at the sale and disposition of fraudulent securities, of securities of fictitious value, of securities by persons or under circumstances likely to result in loss to the purchaser through his being cheated. * * * Sales by unknown and non-resident vendors and sleek peripatetic salesmen, with glib tongues and indurated consciences, of stock or other securities for the purpose of developing wildcat oil fields in distant states, mythical rubber plantations in Guatemala or imaginary copper mines in Mexico, for extracting gold from sea water and light from cucumbers and developing power from the rise and fall of the tides, and for hundreds of visionary schemes, domestic and foreign, designed to secure a great return from a small investment in a short time fall within the terms of the Act. No one will question its application to such cases, even though eventually many of the enterprises may prove successful." (*Stewart* v. *Brady*, 300 Ill. 425, 133 N. E. 310.)

"The great weight of authority is that where a party comes into court seeking to enforce a contract which is against public policy or is prohibited by public law, the court will refuse to aid either party and will leave them where they have placed themselves, and in refusing to enforce such contracts the court does not act for the benefit, or for the preservation of the alleged rights, of either party, but in the maintenance of its own dignity, the public good and the laws of the state." And cases cited. (*Estate of Smythe* v. *Evans*, 209 Ill. 376, 70 N. E. 906.)

As we said in *Glass* v. *Basin & Bay State Min. Co.*, 31 Mont. 21, 77 Pac. 302, quoting from Dean Lawson's article in Cyc., page 546: "No principle of law is better settled than that a

party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out, nor can he set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim. The rule is expressed in the maxims, '*Ex dolo malo non oritur actio,*' and '*In pari delicto potior est conditio defendentis.*' The law, in short, will not aid either party to an illegal agreement. It leaves the parties where it finds them. Therefore neither a court of law nor a court of equity will aid the one in enforcing it, or give damages for a breach of it, or set it aside at the suit of the other, or, when the agreement has been executed in whole or in part by the payment of money or the transfer of other property, lend its aid to recover it back.'' In accord are *Snell* v. *Dwight,* 120 Mass. 9; *Watson* v. *Murray,* 23 N. J. Eq. 257; *King* v. *Winants,* 71 N. C. 469, 17 Am. Rep. 11; *Vandegrift* v. *Vandegrift,* 226 Pa. St. 254, 18 Ann. Cas. 404, 75 Atl. 365; *Kennedy* v. *Lonabaugh,* 19 Wyo. 352, 30 Ann. Cas. 1913E, 133, 117 Pac. 1079; *Hoffman* v. *McMullen,* 48 U. S. App. 596, 83 Ed. 372, 45 L. R. A. 410, 28 C. C. A. 178; *McMullen* v. *Hoffman,* 174 U. S. 639, 43 L. Ed. 1117, 19 Sup. Ct. Rep. 839, and scores of others.

Being void in Illinois where made, the contracts will not be enforced in Montana. (*Bank of Commerce* v. *Fuqua,* 11 Mont. 285, 28 Am. St. Rep. 461, 14 L. R. A. 588, 28 Pac. 291; and see 12 C. J. 449; *Akers* v. *Demond,* 103 Mass. 318; *Kennedy* v. *Cochrane,* 65 Me. 594.)

But it is argued that plaintiff completed the contract on his part, and instead of taking his commissions when he had possession of the money, sent the money to defendant, and that defendant, having received the benefit of plaintiff's activities, should be compelled to account; that a great wrong will be done unless the courts of Montana compel defendant to account. This argument overlooks the fundamental principle just enunciated that the contract being void in Illinois will not be enforced in Montana. But as to plaintiff's not having retained his commissions when he had possession of the money: let it be remembered that he is suing upon express contracts.

Upon one he claims he is entitled to the stock; upon the other he had the option to take his twenty-five per cent commission in cash or in stock at sixty cents a share; he preferred the stock rather than the money. He now sues upon the contract for the value of the stock, not the commission money. Here the language of Judge Caldwell, speaking for the circuit court of appeals of the eighth circuit, is directly applicable: "But, conceding that the contract is illegal and void, the appellant asserts that it has been performed, and that the appellee is bound to account for moneys received under the contract according to its terms. This contention rests on a misconception of the character of this suit. The appellant's claim is grounded on the illegal and void contract, and this suit is, in legal effect, nothing more than a bill to enforce specific performance of that contract. * * * Courts will not lend their aid to enforce the performance of a contract which is contrary to public policy or the law of the land, but will leave the parties in the plight their own illegal action has placed them." (Citing cases.) (*Chicago, M. & St. P. Ry. Co.* v. *Wabash, St. L. & P. Ry. Co.,* 61 Fed. 993.)

In an able opinion the supreme court of New Mexico used the following language, apt in this case: "The vice of appellees' contention consists in looking to the position of the defendant and in making the weakness of the defendant's position the point of decision, whereas the real question to be decided is not what the right of the defendant, who is not seeking relief, may be, but the question is, shall the court enforce at the instance of the plaintiff an illegal contract made in violation of a statute, which renders it criminal and declares a public policy against such transaction as the one brought to the attention of the court in this case was.

"The plaintiff seeks affirmative relief and seeks relief upon the very contract, which is illegal and not otherwise than upon the contract. The question is not what the defendant may plead, but what relief can the plaintiff have on the contract if the facts brought to the attention of the court by the answer be true.

. "Appellees insist, however, that equity, in the enforcement of a superior public policy, will apply the doctrine of estoppel, contended for by appellees, to preclude the appellants from setting up the illegality of the transaction of which they seek to take advantage, and will wink at the *malum prohibitum* of Reinhart's conveyance, in order to prevent the *malum in se* of the defendant's attempted fraud. Appellees rely chiefly upon the case of *Brooks* v. *Martin*, 2 Wall. 70 [17 L. Ed. 732], in support of the proposition, and attempt to apply to this case the principles of that case, holding that an accounting may be had and enforced of the proceeds of an illegal partnership. This case has, however, been criticized, and the general statements made in the opinion have been repudiated in most of the American cases, and it has been limited by the United States Supreme Court to the very facts of that case in *McMullen* v. *Hoffman*, 174 U. S. 639 [supra]." (*Third Nat. Bank* v. *Smith*, 17 N. M. 166, 125 Pac. 632.)

In *Hoffman* v. *McMullen*, 83 Fed. 372, 45 L. R. A. 410, supra, Judge Hawley said: "In dealing with illegal contracts, courts do not and cannot look alone to those who are parties to the illegal transaction. The law regards the welfare of society as paramount, and in enforcing the law, courts will not impair its efficiency or cripple its operations by considerations affecting the interests of those who are *particeps criminis*. The principle of public policy is this: *Ex dolo malo non oritur actio*. No court will lend its aid to a man who founds his cause of action upon immoral or illegal acts. If, from the plaintiff's own showing or otherwise, the cause of action appears to arise *ex turpi causa*, or out of a transgression of a positive law of the country, then the court says he has no right to be assisted. It is upon that ground that the court goes; not for the sake of the defendant, but because it will not lend its aid to such a plaintiff."

*Mexican International Banking Co.* v. *Lichtenstein*, 10 Utah, 338, 37 Pac. 574, arose over the sale of lottery tickets. "The employment of an agent to sell tickets in a lottery is void. (See Mechem, Ag., sec. 38.) Therefore, the relation never in

fact exists. As we have already stated, both parties are principals. They are both in equal fault; and it would appear to be a monstrous doctrine if participants in crime may invoke the power of the civil courts to determine which of them is entitled to a particular share of the spoils resulting from their criminal adventure." (*Martin* v. *Seabaugh*, 128 La. 442, 54 South. 935; *Storz & Iler* v. *Finklestein*, 46 Neb. 577, 30 L. R. A. 644, 65 N. W. 195; *Central Trust & Safe Deposit Co.* v. *Respass*, 112 Ky. 606, 99 Am. St. Rep. 317, 56 L. R. A. 479, 66 S. W. 421.)

"Between those who are equally in the right, or equally in the wrong, the law does not interpose." (Sec. 8753, Rev. Codes 1921; *Melville* v. *Butte-Balaklava Copper Co.*, 47 Mont. 1, 130 Pac. 441.)

In *Morrison* v. *Bennett*, 20 Mont. 560, 40 L. R. A. 158, 52 Pac. 553, Morrison and Davis sued Bennett for an accounting and dissolution of partnership. They alleged that the three had formed a partnership for the purpose of owning, caring for and racing a certain mare known as Lady Wallace, on equal terms and shares, and that they entered upon and continued to transact the business of the partnership and were at the time of the suit partners on equal terms in the business; that Bennett, without plaintiffs' consent, had applied to his own use from the receipts and profits of the business the sum of $1,000 which he continued to withhold to their detriment and damage. The defendant denied the partnership and alleged the ownership in common of the mare. Horse-racing was not contrary to statute nor was it illegal at common law, but the evidence showed that the object of the parties was iniquitous, that the methods agreed upon were dishonest, immoral, deceitful and corrupt. In that case the plaintiffs insisted that if the agreement of partnership was unlawful and immoral the "purpose of such partnership must also be admitted to be accomplished and executed." This court, speaking through Mr. Justice Hunt, said: "The $1,000 was paid to one of the partners. And it is to carry out the partnership agreement to divide profits that this action is brought. 'There

is nothing collateral in respect of which, the agreement being out of the question, a collateral demand arises.' (*Snell* v. *Dwight*, 120 Mass. 9.) In this last case cited the court ably review the decision in *Brooks* v. *Martin*, 2 Wall. 70 [17 L. Ed. 732], cited to us by appellants herein, and properly, we think, treat it as an authority relating to subsequent or collateral contracts and transactions, in which the original illegal acts and contracts are held to form no part of the consideration. The supreme court of North Carolina, in *King* v. *Winants*, 71 N. C. 469 [17 Am. Rep. 11]—a similar case to the one at bar— distinguish *Brooks* v. *Martin*, supra, as did *Snell* v. *Dwight*, supra, and, after so interpreting it, decided that they would not examine into, settle up and enforce, an illegal contract itself between the parties to it. (See, also, *C. M. & St. P. Ry. Co.* v. *Wabash, St. L. & P. Ry. Co.*, 61 Fed. 993, 9 C. C. A. 659; Beach on Contracts, sec. 1522.)'' The court then adopted from *Gray* v. *Hook*, 4 N. Y. 449, and *Woodworth* v. *Bennett*, 43 N. Y. 273, 3 Am. Rep. 706, the following: ''The distinction between a void and valid new contract in relation to the subject-matter of a former illegal one depends upon the fact whether the new contract seeks to carry out or enforce any of the unexecuted provisions of the former contract, or whether it is based upon a moral obligation growing out of the execution of an agreement which could not be enforced by law, and upon the performance of which the law will raise no implied promise. In the first class of cases, no change in the form of a contract will avoid the illegality of the first consideration, while express promises based upon the last class of considerations may be sustained.'' Continuing, the learned justice said: ''It is unnecessary to go further. By the evidence here offered for plaintiff they seek to enforce directly an immoral contract, and to secure the fruits of such a contract. It cannot be done. (Beach on Contracts, sec. 1431.)''

*Morrison* v. *Bennett* is sustained by the almost unanimous view of the courts. It is controlling here, and we have no disposition to depart from the sound doctrine it proclaims.

. But it seems to be contended that plaintiff might prove his case without reference to the illegality of the contract,— by the simple expedient of saying nothing respecting compliance with the Illinois law. In other words, if plaintiff told the truth, but not the whole truth, concealing the fact that the contract was illegal and in violation of the Illinois Act, he might recover notwithstanding the court was advised of the Act, the violation thereof being pleaded. The law does not tolerate such sophistry and subterfuge. ''Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. (*Coppell* v. *Hall*, 74 U. S. 542, 19 L. Ed. 244; *Berka* v. *Woodward*, 125 Cal. 119, 73 Am. St. Rep. 31, 45 L. R. A. 420, 57 Pac. 777.)'' (*Levinson* v. *Boas*, supra.) ''The question is not what the defendant may plead, but what relief the plaintiff can have on the contract if the facts brought to the attention of the court by answer be true.'' (*Bank* v. *Smith*, supra.) ''If, from the plaintiff's own showing or otherwise, the cause of action appears to arise *ex turpi causa*, or out of a transgression of a positive law of the country, then the court says he has no right to be assisted.'' (*Hoffman* v. *McMullen*, 83 Fed. 372, 45 L. R. A. 410.)

When *Hoffman* v. *McMullen* reached the United States supreme court, Mr. Justice Peckham speaking for the court, said: ''The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract. In cases of this kind the maxim is *potior est conditio defendentis.* * * * Upon the point as to the ability of the plaintiff to make out his cause of action without referring to the illegal contract, it may be stated that the plaintiff for such purpose cannot refer to one portion only of the contract upon which he proposes to found his right of action, but that the whole of the contract must come in, al-

though the portion upon which he founds his cause of action may be legal. (*Booth* v. *Hodgson,* 6 T. R. 405; *Thomson* v. *Thomson,* 7 Ves. Jr. 470; *Embry* v. *Jemison,* 131 U. S. 336, 359 [33 L. Ed. 172, 9 Sup. Ct. Rep. 776.]) * * * In the case before us the cause of action grows directly out of the illegal contract, and if the court distributes the profits it enforces the contract which is illegal.'' (*McMullen* v. *Hoffman,* 174 U. S. 639, 43 L. Ed. 1117, 19 Sup. Ct. Rep. 839; *Kennedy* v. *Lonabaugh,* 19 Wyo. 352, 30 Ann. Cas. 1913E, 133, 117 Pac. 1079.)

In proving a case a party must make a full and fair disclosure of all the facts governing the transaction; he cannot prevail by presenting only such facts as favor him when if all the facts were presented he could not prevail.

Section 7506, Revised Codes 1921, provides: "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void."

Three recent cases arising under "Blue Sky" laws are of particular interest. A case directly in point is *Zerr* v. *Lawlor* (Tex. Civ. App.), 300 S. W. 112, where as here, plaintiff attempted to collect twenty-five per cent commissions when the law permitted but twenty per cent. He failed. In *Dixie Rubber Co.* v. *Catoe,* 145 Miss. 342, 110 South. 670, it was held that a contract between a corporation, which had not complied with the law, and a salesman respecting the sale of the corporation's stock was unlawful, void and unenforceable. The court said: "It seems plain that appellant would have been required to prove the contract between it and appellee Cadenhead, by which the latter received the commissions, and rely on its illegality under the law for its right to recover. The illegality of the contract would have been met at every turn in the case from start to finish; it could not have been put out of sight. It would have been the very life of the case. It could not have been shown, except by virtue of the contract itself, that appellee Cadenhead had the illegal commissions in his possession. And the only ground on which

appellant could have claimed the right to recover the commissions would have been that the contract itself by which the commissions had been paid, was illegal. Every move in the case would have depended on the illegal contract. So we are of opinion that, if appellant had sued appellee Cadenhead for the $44,000 commissions, there could have been no recovery because of the illegality of the contract by which the commissions had been paid or received."

In *List* v. *Republic Bond & Mortgage Co.* (Cal. App.), 271 Pac. 529, it appeared that sales of stock had been made in violation of the Corporate Securities Act of California. In the course of its opinion denying relief to the plaintiff, a broker suing for commissions, the court said: "Notwithstanding, then, the good faith of the plaintiff in demanding his share of the commissions on what he believed was a legitimate sale, he cannot be permitted to recover for any services he may have rendered in even unconsciously aiding the officers of the company in consummating an unlawful or void sale, denounced by the statute as the commission of a felony." (And see *Superior Reducing & Refining Co.* v. *Handlaw, Hearne & Co.,* 100 W. Va. 547, 131 S. E. 857.)

It is said that justice demands a judgment for plaintiff. What is justice? queried Socrates. Whatever it may be, it is not the fiat of the individual judge following his own philosophy, but is in a legal sense "that end which ought to be reached in a case by the regular administration of the principles of the law involved as applied to the facts." (*Meeks* v. *Carter,* 5 Ga. App. 421, 63 S. E. 517; *Sioux Falls* v. *Marshall,* 48 S. D. 378, 45 A. L. R. 447, 204 N. W. 999; *Nelson* v. *Wilson,* 81 Mont. 560, 264 Pac. 679.)

The moral issue between plaintiff and defendant, if such it may be termed, is no concern of ours. Under the pleadings, and theory of the case pursued by the litigants and the trial court, it cannot be determined in this action. Whether (the contract being legal) the defendant made himself personally liable because of the letters he wrote plaintiff need not now be considered. That plaintiff understood that he was selling

the stock for the Fulton Oil Company, and for Essex, Rice and Fulton, and not for Fulton alone, the record shows conclusively.

The remarkable argument is made that those to whom McManus sold stock are not complaining. The necessary inference must be that the satisfaction or dissatisfaction of a purchaser is a determining factor in considering the effect of the public policy of a sovereign state. It is tantamount to asserting that the Blue Sky Law of Illinois (and on a parity of reasoning the Blue Sky Law of Montana) is not effective unless a purchaser of prohibited stock raises the cry that he has been defrauded. Surely this curious position does not call for further comment.

It is said the defense is dishonest. Granted, but Lord Mansfield said: "The objection that a contract is immoral or illegal, as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded in general principles of policy. No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." (*Homan* v. *Johnson,* 1 Cowp. (Eng.) 343.)

A void contract cannot be enforced, no matter what hardship it may work or how strong the equities may appear. (*Howard* v. *Farrar,* 28 Okl. 490, 114 Pac. 695.)

There is no new nor collateral contract in this case. The plaintiff must stand or fall upon contracts between himself and defendant confessedly illegal and void under the laws of Illinois.

We conclude in the words of the supreme court of the United States: "We must, therefore, come back to the proposition that to permit a recovery in this case is in substance to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defense is

a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations and in order the better to secure the public against dishonest transactions. To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law." (*McMullen* v. *Hoffman*, 174 U. S. 639, 43 L. Ed. 1117, 19 Sup. Ct. Rep. 839.)

The motion for a rehearing, having served its purpose, is denied. The opinions filed March 11, 1929, are now withdrawn.

The judgment is affirmed.

ASSOCIATE JUSTICES MATTHEWS and ANGSTMAN concur.

MR. JUSTICE GALEN: I dissent. Upon consideration of the petition for a rehearing I have given further earnest thought and study to this case which has tended only to confirm my views as to the correctness of the result reached in the original majority opinion. The balance in the scales of justice has been turned, but not so with my opinion. I still maintain the soundness of my conclusions reached in the original opinion.

In this action the plaintiff seeks to recover damages for alleged breach of contract. The complaint sets forth two causes of action, the first of which is predicated upon the sale by the plaintiff under contract with the defendant of 12,200 shares of stock in the Fulton Oil Company, at the par value of one dollar per share, or better, at an agreed commission of twenty-five per cent, all of which money was delivered to the defendant without deduction of commission or other deduction,

with the understanding and agreement that the plaintiff would be permitted to convert the amount of his commissions into stock of the Fulton Oil Company at the rate of sixty cents per share, whereby the plaintiff became entitled to 5,083 shares of such stock, which agreement the defendant failed to carry out to plaintiff's damage in the sum of $35,581. The second cause of action is based upon the breach of an agreement whereby, in consideration of services rendered by the plaintiff in the sale of 50,000 shares of stock in the Fulton Oil Company, belonging to Fulton and his associates, for the sum of $30,000, the defendant promised and agreed to deliver to the plaintiff 3,000 shares of stock in that company, occasioning the plaintiff additional damages in the sum of $18,000. In defense the defendant pleaded want of consideration for the contracts, and the illegality thereof, because in violation of the Blue Sky laws of the state of Illinois. At the conclusion of the voluminous evidence introduced by both parties upon the trial, the plaintiff moved the court for a directed verdict, whereupon the court denied the plaintiff's motion, and of its own volition took the case away from the jury and ordered judgment in favor of the defendant on both causes of action. In pursuing such course, the learned district judge said: "I feel that the merits of this case are with the plaintiff. I feel that he went out of his way to sell this stock to his relatives and friends in Illinois, honestly with the belief that they were getting a good proposition, and that they did get a good proposition; that he turned all the money that he received from them over to the defendant and his associates in the state of Montana; and as a matter of equity and right that he is entitled to his commissions under the contract that was made back there; but I feel that I cannot shift this burden which is placed upon me to you men as jurors, because if you brought in a verdict for the plaintiff in this case I feel that I would have to grant a new trial on it."

The evidence amply sustains all of the material allegations of the plaintiff's complaint. His right to recovery is clear unless the contracts are illegal, by reason of the application of

the Illinois Securities Act relied upon by the defendant to avoid his obligations. Admittedly the stock sold by the plaintiff is of the "class D" character mentioned in the Illinois statute; however, it does not appear that complaint has been made by any person or persons to whom the stock was sold. Seemingly they are satisfied with the investment. The defendant admits the receipt of all of the money obtained by the plaintiff in sale of the stock, and the plaintiff's commission interest therein, but denies liability to deliver to the plaintiff stock in the Fulton Oil Company as he had agreed.

A brief statement of the facts will be found illuminating. It appears that the Fulton Oil Company was organized under the laws of the state of Montana with a total capitalization of $200,000, divided into 200,000 shares of the par value of one dollar each, and that the defendant and his associates having obtained an operating lease on a tract of 160 shares of land in Toole county, organized such corporation for the purpose of exploring and developing oil and gas under such tract of land in accordance with the lease agreement. The defendants had but a short time, a period less than sixty days, within which to commence drilling on the land and thus preserve rights under the lease of the land. Following organization of the company, the defendant and his associates, W. H. Essex and W. E. Rice, proposed to the company to transfer and assign the lease to it in consideration of the issuance to them, or to those whom they might designate, of a total of 115,000 shares of the capital stock of the company, for which in addition to the assignment of such lease, they agreed to pay the company in cash the sum of $30,000 to enable it to proceed with work upon the property. In carrying out such agreement with the company, the defendant proceeded to the city of Chicago in the state of Illinois, in March, 1925, and later, on April 24, 1925, with the aid and assistance of the plaintiff in Chicago, made sale of 50,000 shares of stock in the company, to which Fulton and his associates were entitled, to William McGinley and Wayne Ponting, for the sum of $30,000, which sale has been fully executed. Although the amount of

plaintiff's compensation for this transaction had not been agreed upon, it had been discussed and considered, and clearly understood that the plaintiff should be compensated, and after that deal was closed, the defendant agreed to deliver to the plaintiff 3,000 shares of stock in the Fulton Oil Company for the latter's services. This agreement was subsequently reduced to writing, is pleaded in the amended complaint and was proven at the trial. It reads as follows:

"Mr. Thomas J. McManus,

"No. 856 First National Bank Bldg.,

"Chicago, Ill.

"Dear Sir:

"Under date of April 24, 1925, I agreed to deliver to you 3,000 shares of the capital stock of the Fulton Oil Company for services you had rendered in negotiating the sale of stock in said company to McGinley and Ponting. Since final payments have not yet been made, I am placing the number of shares in escrow in the Sunburst State Bank at Sunburst, Montana, to be delivered to you upon completion of such payments, by McGinley and Ponting.

"Yours very truly,

"(Signed) W. M. FULTON."

The defendant failed to carry out this agreement, in consequence whereof the plaintiff predicates his right of recovery as stated in the second cause of action.

On the first cause of action stated it appears the plaintiff subsequently made sales to others to the total of 12,200 shares, for one dollar per share or better, and remitted the money so received to Fulton without deduction. Plaintiff would have completed the contract and sold the entire 15,000 shares allotted to him within the time agreed upon, but for the fact that the defendant refused to permit him to sell more of the stock. Under the terms of this contract the cash commissions earned by the plaintiff and by him remitted to the defendant without deduction amounted to $3,050, which the plaintiff elected to convert into Fulton Company stock at sixty cents per share,

pursuant to the contract, thereby becoming entitled to 5,083 shares unless the contract is unenforceable.

The defendant Fulton testified: "I do not dispute that Mr. McManus sold a total of 12,200 shares of stock; that is correct. For those sales he had a commission of twenty-five per cent which would amount to $3,050 in cash. All of that money, $12,200, and something in excess of that, because some of the stock was sold for more than par, was paid over to me * * * Certainly I admit that the plaintiff has 5,083 shares of stock coming to him from the Fulton Oil Company. That was his claim against the Oil Company. As to whether I have ever admitted it, I have never denied it. * * * Certainly I was using all the money McManus remitted to me, but at the same time I could have replaced it any minute that he wanted it. * * * What if I did use the money that I received from McManus? As to my using it for my own purposes, I told you that I could have replaced it at any time McManus wanted it and was prepared to do it, had assurances of money if I wanted it, but I didn't want to be borrowing money if I could get it from the sale of stock. * * * As to whether I was actually using the entire remittance that he was sending me, I was using and paying no attention to that money. * * * I did not segregate it; there was no reason why I should do it. Certainly I used all the money that he remitted to me. * * * As to my never having turned it over to the Fulton Oil Company or anybody else, I offered it to McManus and he refused it, and the company have not turned over the stock, and I am ready when they turn over the stock to give them $3,050 and the interest that I have had on it. * * * As to my part of it being the proceeds of the Essex stock, my instructions for McManus were to turn that money to the Fulton Oil Company for stock of the company. * * * I did not, in any letter to McManus prior to September, 1925, indicate to him that he would have to look to the Fulton Oil Company to get his stock; I don't know that I did definitely * * * . He had, of course, remitted the money to me. In all the letters that have passed between

us I did not offer to return to him the $3,050, but I invited him to come out and get his settlements.''

Fulton further testified to a conversation had between himself and McManus, during the time McManus was selling the stock and before the money was remitted, in which Fulton tried to get McManus to agree to take his compensation in money, but McManus insisted on ''investing the cash that I *have already earned* and am to remit'' in stock, and suggested that he would remit the full one hundred per cent to Fulton (not the Fulton Oil Co.) and that Fulton should withhold the commission money and ''invest it'' in Fulton Oil stock at sixty cents a share. This, Fulton states, he finally agreed to do. This agreement was made with Fulton as an individual, and not with the Oil Company which he represented, and by it he agreed to receive, ''as agent for McManus,'' the money which McManus could have retained as commissions earned, Fulton having promised to ''invest it'' in stock for McManus and agreeing that McManus should purchase the stock at sixty cents a share.

McManus helped in closing the deal with McGinley and Ponting whereby the Fulton Oil Company was provided with the $30,000 in money necessary to proceed under the terms of the drilling agreement with the land owners in the exploration and development for oil and gas. And according to Fulton's testimony, he then agreed to pay McManus ten per cent commission. ''McManus said, 'now you have closed the deal with Mr. McGinley on the basis of sixty cents on the dollar or share. Now, if I cut this commission to 10% I want the privilege of investing this cash of mine in the capital stock of the Fulton Oil Company at 60¢ a share, figuring that my money is just as good as McGinley's and the company ought to sell me that stock.' And on that sort of basis we agreed. The McGinley deal involved $30,000 in cash and $50,000 in shares. As to whether I did give him the privilege then of taking stock at 60¢ a share, he was to take 3,000 of this for his commission on this $30,000 deal to McGinley. As to that being

neither 10% of the stock nor 10% of the cash I just figured that having the stock at par, 3,000 shares was 10% of $30,000.''

The record discloses that at the time of the trial, June 21, 1927, two dividends had been declared on the stock of one hundred per cent each and that the stock then had increased seven hundred per cent, to a market value of seven dollars per share. A bare statement of the facts in this case, and of the views expressed by the trial court made manifest the great injustice which will result from an affirmance of the judgment. Is it possible that under the law, this court is required to lend its aid to the defendant in avoidance of his contracts? The contracts made the basis of plaintiff's alleged right of recovery, are under the circumstances of the case, no fraud being suggested or shown, neither void nor voidable under the common law. However, we are obliged under familiar principles to recognize and enforce the law of Illinois, as applied to contracts there to be executed and performed. (*Bank of Commerce* v. *Fuqua*, 11 Mont. 285, 28 Am. St. Rep. 461, 14 L. R. A. 588, 28 Pac. 291.) It must be kept in mind that this action is not based on any contract made with those who purchased stock in the Fulton Oil Company. Rather, it is founded upon the contracts between McManus and Fulton for the sale of the stock. It is, however, important to consider the validity of the contracts made with stock purchasers because of possible influence and effect those contracts may have upon the contracts in question. The Illinois Securities Act is, then, the criterion by which the validity or invalidity of the purchasers' contracts are to be judged. If that statute totally condemns them, they must fall. If that statute recognizes them as valid and enforceable for some purposes and under some circumstances, we must do the same.

In construing a statute which imposes a specific penalty for its violation, the entire Act must be examined to determine whether or not it was the purpose of the law makers, in addition to imposing penalties for the violation of the law, to render void contracts based on the methods prohibited. (*Warren People's Market Co.* v. *Corbett & Sons*, 114 Ohio

St. 126, 151 N. E. 51.) In the case of *Harris* v. *Runnels,* 12 How. (U. S.) 79, 13 L. Ed. 38, where the illegality of the contract involved was invoked, it was by the supreme court of the United States said: "We have concluded before the rule can be applied in any case of a statute prohibiting or enjoining things to be done with a prohibition and a penalty, or a penalty only, for doing a thing which it forbids, that the statute must be examined as a whole, to find out whether the makers of it meant that a contract in contravention of it should be void, or that it was not to be so. In other words, whatever may be the structure of the statute in respect to prohibition and penalty, or penalty alone, that it is not to be taken for granted that the legislature meant that contracts in contravention of it were to be void, in the sense that they were not to be enforced in a court of justice. In this way, the principle of the rule is admitted, without at all lessening its force, though its absolute and unconditional application to every case is denied. It is true that a statute, containing a prohibition and a penalty, makes the act which it punishes unlawful, and the same may be implied from a penalty without a prohibition; but it does not follow that the unlawfulness of the act was meant by the legislature to avoid a contract made in contravention of it. * * * It is not necessary, however, that the reverse of that should be expressed in terms to exempt a contract from the rule. The exemption may be inferred from those rules of interpretation to which, from the nature of legislation, all of it is liable when subjected to judicial scrutiny. That legislators do not think the rule one of universal obligation, or that, upon grounds of public policy, it should always be applied, is very certain. For, in some statutes, it is said in terms that such contracts are void; in others, that they are not so. In one statute there is no prohibition expressed, and only a penalty; in another, there is prohibition and penalty, in some of which contracts in violation of them are void or not, according to the subject matter and object of the statute; and there are other statutes in which there are penalties and prohibition, in which contracts made in

contravention of them will not be void, unless one of the parties to them practices a fraud upon the ignorance of the other. It must be obvious, from such diversities of legislation, that statutes forbidding or enjoining things to be done, with penalties accordingly, should always be fully examined, before courts should refuse to give aid to enforce contracts which are said to be in contravention of them.''

Judge Sanborn, speaking for the court of appeals of the eighth circuit, in the case of *Dunlop* v. *Mercer,* 156 Fed. 545, said: ''The general rule that an illegal contract is void and unenforceable is, however, not without exception. It is not universal in its application. It is qualified by the exception that where a contract is not evil in itself, and its invalidity is not denounced as a penalty by the express terms of or by rational implication from the language of the statute which it violates, and that statute prescribes other specific penalties, it is not the province of the courts to do so, and they will not thus affix an additional penalty not directed by the law-making power.'' Here that learned jurist cited numerous decisions in support of the exceptions noted, and then proceeded: ''The case of *Fritts* v. *Palmer,* 132 U. S. 282, 287, 33 L. Ed. 317, 10 Sup. Ct. Rep. 93, is an apt and striking illustration of this exception. The constitution of Colorado read, 'no foreign corporation shall do business in the state without having one or more known places of business, and an authorized agent or agents upon whom process may be served,' and the statutes required that such a corporation before doing any business in the state, should file a certificate of its Articles and appoint an agent upon whom service of process could be made. They expressly prohibited any foreign corporation from doing any business and from purchasing or holding any real estate until it had filed its Articles and appointed its agent, and they imposed as a penalty for a violation of this prohibition the personal liability of every officer, agent, and stockholder of the corporation for the obligations incurred by it while it was doing business in the state in violation of the statute. A foreign corporation acquired, held, and conveyed real estate

in Colorado in violation of this constitution and these statutes. The supreme court held that the deeds were illegal, but that they were valid, and that they conveyed the property, and it sustained the title on the ground that the imposition of the penalty of the personal liability of the officers and stockholders, without any imposition of the penalty that contracts and deeds in violation of the statute should be void, indicated that the legislature did not intend to make, and did not make, such deeds and contracts void by the statute.''

The supreme court of appeals of Virginia in a comparatively recent case (1923) in construing and applying the provisions of the Blue Sky Law of that state in attempted avoidance of a subscription contract for stock in a corporation, said: ''The intent of the legislature, as disclosed by the Act, must govern. When tested by this rule, we are driven to the conclusion that the Virginia Blue Sky Law shows legislative intent not to make void and unenforceable contracts entered into in violation of the provisions thereof. The Act, as appears from its title, was enacted to prevent unfairness, imposition, and fraud in the sale or disposition of certain securities by requiring an inspection and regulation of the business of those engaged in or intending to engage in the sale of such securities. * * * The legislature excepts certain classes of securities from the operation of the Act. * * * It is manifest that the legislature enacted the statute in the public interest and that to declare contracts made in violation of its provisions unenforceable and void would be an additional means of compelling the observance of the law. But we cannot so hold if the Act negatives the intention that such contracts should be so construed. A consideration of the entire statute convinces us that the real purpose of the Act was to give the commission the power to regulate the sale of certain securities and to require the promoters of such securities to honestly apply the proceeds of sale thereof, as far as may be necessary to prevent unfairness, imposition, and fraud. And since it is provided * * * that the Act shall not be construed to prevent the sale of purely speculative securities, it is apparent

that the legislature intended, not to make void and unenforceable contracts made in violation of its terms, but simply to leave those violating the provisions of the law, or refusing to comply with any order of the commission, amenable to the penalties and subject to the regulation prescribed by the Act." (*Watters & Martin* v. *Homes Corporation*, 136 Va. 114, 116 S. E. 366.) A contract made by parties *sui juris* will not be nullified as between them merely because it is contrary to a police statutory provision, imposing a penalty for those disregarding prescribed formalities. (*Parton* v. *Hervey*, 1 Gray (Mass.), 119; *Bly* v. *Second Nat. Bank*, 79 Pa. St. 453.)

Turning now to an examination of the Illinois statute, it should be noted that we are not aided in its construction by any decisions of the supreme court of that state applicable to the situation here presented. The Illinois Securities Act defines "Class D" stock as that which is of a "speculative character" and requires solicitors, agents, or brokers selling or offering any such securities for sale, to make compliance with the law by filing certain designated papers and statements with the secretary of state (sec. 9, Laws of 1919), providing that a violation of the Act shall constitute a misdemeanor punishable by both fine and imprisonment. (Sec. 29, Laws of 1919, as amended by Act of 1925, Laws 1925, p. 555.) A similar provision is to be found in the law applicable to owners, issuers and the officers, directors, trustees or agents of any company issuing such stock and selling or offering the same for sale in violation of the Act, with similar penalties. (Id., secs. 29 and 30, p. 565.) It is provided that "if the securities be intended to be offered and sold by the issuer through solicitors, agents, or brokers, an irrevocable contract executed by each such solicitor, agent or broker authorized to offer or sell such securities by or on behalf of the issuer," shall be filed in the office of the secretary of state, "to the effect that the issuer will receive in cash not less than 80% of the proceeds of each sale of the securities without deduction for any commission or expenses, directly or indirectly, and without liability to pay any sum whatsoever as commission or expenses or for services in and

about such sale." (Sec. 9, subd. 14, p. 357.) And "any person interested in securities in class 'D' may maintain in the name of the issuer an action at law or a suit in chancery for the use of the issuer, against the solicitor, agent or broker of such issuer, jointly or severally, to recover of such solicitor, agent or broker all moneys in excess of 20% of the proceeds of the sales of securities made by such solicitor, agent or broker and not turned into the treasury of the issuer." (Sec. 35, Ill. Laws of 1919, p. 363.)

By section 37 of the Act, as the same was amended in 1921, it is provided in part that "every sale and contract of sale made in violation of the provisions of this Act *shall be void at the election of the purchaser*, and the seller of the securities so sold, the officers and directors of the seller, and each and every solicitor, agent or broker of, or for such seller, who shall have knowingly performed any act or in any way furthered such sale, shall be jointly and severally liable in an action at law or in equity, upon tender to the seller or any court of the securities sold to the purchaser or the amount paid, the consideration given or the value thereof, together with his reasonable attorney's fees in any action brought for such recovery." (Laws Ill. 1921, p. 357.) It is to be noted that by section 37 of the statute as enacted in 1919, pleaded by the defendant, every sale and contract of sale made in violation of any of the provisions of the Act was declared to be void, whereas by the amendment of such section, effective when the stock sales were made, the legislative policy was changed for reasons best known to the legislature, so as to provide that such stock sales would be considered *"void at the election of the purchaser."* As the law existed at the time the stock was sold, it is clear that it permitted avoidance of such contract only at the election of the stock purchaser; and it should be observed that the statute as originally enacted, and also as amended, is silent with respect to the legality of contracts collateral to the sale of stock such as are here involved, i. e., the agreement with the agent to sell the stock on commission. Under the effective declared legislative policy, the sales of

stock to purchasers are to be considered void only "at the election of the purchaser," the seller being subject to the penalties prescribed. It is manifest that the statute was enacted to protect the public and the purchasers of stock, not to invalidate contracts between the parties in interest placing such stock as to their independent rights and obligations. It was, of course, competent for the sovereign state of Illinois within the exercise of the police power, to denounce and condemn as void all contracts not preceded by compliance with the statute, or to provide criminal penalties for the conduct of individuals omitting to meet the prescribed formalities, or both, But the crucial fact here is, that the statute does not void the contracts under consideration. It prohibits methods of selling class "D" stock in Illinois under duress of criminal penalty, but leaves the contracts of sale under some circumstances entirely unaffected; and in any event, leaves them enforceable at the option of stock purchasers. They cannot be valid and void at the same time. Neither Fulton nor McManus can escape the statutory penalties under given circumstances. But Illinois drew a line between criminal liability and contract enforceability. It is not for us to obliterate the distinction; but rather to apply the statute as written; not to supply a fancied policy to denounce contracts which the statute recognizes as voidable only, or independent contracts to which it makes no reference. A penalty is prescribed by the statute for those who sell stock in violation of the law, and the sale or contract for sale of such stock is declared to "be void at the election of the purchaser"; but the statute, like its predecessor, is silent as to the collateral agreements such as are here involved, i. e., contracts to compensate an agent for making such sale agreements, whereby the agent procures the money and delivers it to the owner of the stock in aid of the project; the only consequence growing from the illegal act of selling the stock is that the plaintiff is subject to the penalties prescribed by the statute. (*Mau* v. *Montana Pac. Oil Co.* (Del. Ch.), 141 Atl. 828.)

The Illinois statute has not only prescribed the penalties for its disregard, but has specially set forth the remedy in

case of its violation. If the agent in selling the stock has done so in violation of the law the purchaser may maintain "an action at law or in equity" to enforce the liability of the "agent, solicitor or broker" to repay "the consideration given or the value thereof, together with his reasonable attorney's fees." (Sec. 37 as amended by Act of 1921.) And "in addition to the penalties and other remedies provided in this Act the Secretary of State shall, when in his opinion and judgment sales of securities by any owner, dealer, broker, solicitor or agent will work or tend to work a fraud upon purchasers, without notice, apply for an injunction, and the courts shall have power to restrain" such agents, and others named. (Sec. 23 of Act of 1919, as amended by Laws 1925.) The penalties and remedies so prescribed by the lawmakers are exclusive, and it does not lie within the province of the courts to add further penalty.

From a reading of the provisions of the Act it seems clear that the contracts made, whereby Fulton employed McManus to help in the sale of the stock, were not illegal at the time they were made. So far as the Illinois Securities Act is concerned, the contract of employment could have been fully performed without any violation of the provisions of the Act. Sale of the stock in any of the following ways would not have been in violation of the Illinois Act: (1) sale of the stock in one isolated sale (sec. 5, Act 1919) ; (2) sale of stock to any bank, trust company or insurance company, or association organized under the banking or insurance laws, or any building and loan association, or to any public sinking fund trustees (Id., sec. 5) ; (3) sale to any corporation or broker or dealer in securities (Id., sec. 5) ; (4) sale outside of the state of Illinois to any person whomsoever; (5) sale within the state of Illinois to any person whomsoever, provided the stock was first registered and qualified. Since the contract could be legally performed by making the sales in any of the various ways above noted, the contract did not require the violation of the Illinois statute.

It is difficult to perceive how the statute enacted for the protection of the public is to be rendered more effective by leaving Fulton the unquestioned right to the money obtained as a result of stock sales made by or through the agency of McManus, instead of requiring him to do justice as between themselves, or what rule of public morals will be weakened by requiring him to do so. The stock sales are rendered voidable at the election of the purchaser under the statute, not absolutely void. This is not a case wherein the purchasers or subscribers of stock are endeavoring to avoid liability or recover back money paid in purchase thereof, but rather the right of the broker to recover compensation agreed to be paid after a complete execution of the contracts by him. The transactions between the plaintiff and the defendant, so far as the right of plaintiff to stock in the company is concerned, is not different from what would have been if, during the time the plaintiff made sales of the stock in Illinois or elsewhere, and remittances therefor to the defendant, the plaintiff had in fact regularly retained his twenty-five per cent commission and afterwards remitted the same to the defendant, asserting his right under the contract to have the same applied in purchase of stock in the company at the rate of sixty cents per share. In such a situation the defendant, after receiving the money and retaining it, would not be heard to say in defense that the plaintiff had obtained the money remitted in an illegal transaction and consequently the defendant is absolved from his contract with the plaintiff. The contracts entered into between the parties made no provision that the money should be by the plaintiff obtained in the state of Illinois in violation of the law, or otherwise or at all in violation of the law. The plaintiff, under the contract, might have secured the money in South Africa or elsewhere, where there existed no such regulatory statute. Merely the place or means by which the money was in fact obtained will not work a nullification of the defendant's agreement to compensate the plaintiff for money in fact obtained under the contract and placed in the defendant's pocket for the accomplishment of the defendant's

project. As clearly shown by the evidence, as respects the first cause of action, Fulton's agreement with McManus was to give the latter stock in the Fulton Oil Company at sixty cents per share for McManus' commissions earned in money and delivered over to Fulton without deduction for that specific purpose. And as to the second cause of action, the defendant having agreed to compensate the plaintiff for services rendered, after accomplishment made in securing $30,000 with which to make possible the contemplated operations of the Fulton Oil Company, the defendant then and there agreed to give the plaintiff 3,000 shares of the Fulton Oil Company stock for the services rendered. In my opinion these transactions constituted wholly independent and collateral contracts capable of being proven without reference to the original brokerage contracts, and of themselves in no manner illegal. It follows that the services rendered by the plaintiff in these transactions were not violative of the law, were based on a valid consideration, and therefore he is lawfully entitled to the shares of stock Fulton agreed to give him by way of compensation.

But aside from all of the foregoing discussion and considerations, there is further reason why the plaintiff is legally entitled to recover, even were the contracts illegal, and that is, because the contracts have been fully executed and plaintiff's share of the money is now in the defendant's hands in trust for the plaintiff. The defendant holds the money as a depositary. In this respect he is in no different position than a third person or a bank with whom plaintiff's share of the money had been deposited for the particular purpose. The defendant admits that there is due the plaintiff the commission agreed upon for the money collected and paid to the defendant without deduction, and this court should not inquire into the way in which the money came into his possession, admittedly the plaintiff's property. (*Robertson* v. *Business Boosters' Country Club*, 212 Ala. 621, 103 South. 576, and cases cited.) "The authorities almost uniformly hold that when an illegal contract has been fully executed, and the interests and differences of the parties to it adjusted and agreed

upon, and the money arising therefrom deposited to the credit of one or more of the respective parties, such depository cannot, when sued by the party or parties to whom the money is due, successfully plead the illegality of the contract or transaction through which the money was originally obtained." (*Overholt* v. *Burbridge,* 28 Utah, 408, 79 Pac. 561.) "Certainly where the profits of an illegal transaction have been actually divided or invested in other property, the illegality of the original transaction in no way affects the title to such property or subsequent dealing in regard to it. If one of the parties to an illegal and unenforceable contract, who has received profits under it, admits that a specified sum is due the other party, it has been held that the latter may maintain an action on an account stated between them; or if he has made a special promise to pay him the action may be brought on that promise." (13 C. J., p. 505; see, also, *McBlair* v. *Gibbes,* 17 How. 235, 15 L. Ed. 132; *Forster* v. *Hill* (C. C. A., 6th Circuit), 215 Fed. 73; *In re Dorr* (C. C. A., 9th Circuit), involving a Montana statute on gambling transactions, 186 Fed. 276.) In *Willson* v. *Owen,* 30 Mich. 374, Judge Cooley said: "It is true that the trials of speed for money at the horse fair and the selling of pools under the auspices of the association were illegal; but there is no illegality in the promise, express or implied, of the defendant to pay over to the plaintiffs the money received for them, from whatever source derived, or from whatever transaction springing." "Where money or property has been actually paid or delivered to an agent for his principal, it is usually held that the latter may recover such money or property from the agent, although it was received by the agent as the fruits of an illegal contract or transaction. The fact that the contract or transaction between the principal and the third person, in pursuance of which the funds or property was delivered to the agent, was illegal and unenforceable does not affect the liability of the agent to account therefor to the principal; this has been held true, although the agent negotiates the illegal transaction or is otherwise a participant therein." (2 C. J., p. 746.)

In the case of *Brooks* v. *Martin,* 2 Wall. 70, 17 L. Ed. 732, the supreme court of the United States held that after a partnership contract, confessedly against public policy, had been executed a partner in whose hands the profits are, will not be permitted to refuse to account for and make division thereof on the ground of the illegal character of the original contract. The money in the defendant's possession, representing the plaintiff's commissions on stock sales, certainly does not belong to the defendant, and he has no right thereto, either moral or legal, to retain it. To allow the defendant, as a depository of the plaintiff's money, to avoid his contract because the owner of the money had violated the law in obtaining it, would be manifestly unjust. After the contract has been executed, the party in possession of all of the gains resulting from illegal transactions, will not be tolerated to interpose objection that the means by which the money was procured is in violation of the law. (*Gilliam* v. *Brown,* 43 Miss. 641; *Willson* v. *Owen,* 30 Mich. 474.)

Though an illegal contract will not be enforced, yet where such a contract has been executed, and the illegal object accomplished, and the money has been received and applied in pursuance of the contract, there is a lawful consideration as between the parties and the courts will not attempt collaterally to unravel the transaction in order to discover the origin of the money. (*Planters' Bank* v. *Union Bank,* 16 Wall. 483, 21 L. Ed. 473.) The transaction alleged to be illegal is closed, and will not in any manner be affected by what the court is asked to do between the parties themselves. In a somewhat similar situation the supreme court of Washington said: "This is not a case to enforce any illegal contract, but it is to assert title to money which has accumulated under such illegal contract." (*McDonald* v. *Lund,* 13 Wash. 412, 43 Pac. 348.)

Supposing that McManus had sold and delivered Fulton's stock in the company as the latter's agent and having completed the sales and collected the money from the purchaser, would a court of justice permit McManus to escape liability for an accounting with Fulton, by reason of the fact that

McManus had sold the stock in violation of the prohibitory statute of Illinois? I think not. I agree with that which was said by Mr. Justice Downey, speaking for the supreme court of Indiana, that it is very much to be doubted "whether the legislature intended in the enactment of the statute in question to produce or sanction any such consequences as that the agent, after having received the money of the principal and after the transaction between the principal and third persons was completed, should be allowed to repudiate the agency, and keep the money, applying it to his own use. The obligation of the agent to account for the money is separate and distinct from the contract of the company with third persons which were the subject matters of the statute. To hold that the agent is not bound to account for the money received by him is to sanction an act of the grossest dishonesty and bad faith on the part of the agent without the accomplishment of any equivalent benefit to anyone or to the public." (United States Express Co. v. Lucas, 36 Ind. 361.) Like principles should be here applied, where the principal has received and retains all of the money derived on the stock sales and refuses to perform his separate, independent contract in consideration of the money being handed to him without deduction by the agent. "One cannot make a shield of a void contract to rob an associate." (Lasswell Land & Lumber Co. v. Lee Wilson & Co., 236 Fed. 322, Sanborn, Adams and Carolan, Circuit Judges.) "Is the man who has paid over the money to another's use to dispute the legality of the original consideration? Having once waived the legality, the money shall never come back into his hands again. Can the defendant then, in conscience, keep the money so paid? For what purpose should he retain it? To whom is he to pay it over? Who is entitled to it but the plaintiff?" (Mr. Justice Butler, in Tenant v. Elliott, 1 Bos. & P. 3, 126 Eng. Rep. 744.) "In Faikney v. Renous, 4 Burr. 2069, where two persons were jointly concerned in an illegal stock jobbing business with a third, and a loss having arisen, one of them paid the whole and took security from the other for his share, the security was held to

be valid as a new contract, unaffected by the original transaction. And in *Petrie* v. *Hannay,* 3 T. R. 418, where one of the partners, under similar circumstances, paid the whole at the instance of the other, he was allowed to recover for the proportionate share. These cases are examined and approved in *Armstrong* v. *Toler,* 11 Wheat. 258 [6 L. Ed. 468].'' (*McBlair* v. *Gibbes,* supra.)

To illustrate: ''Two men enter into a conspiracy to rob on the highway, and they do rob, and while one is holding the traveler the other rifles his pocket of $1,000, and then refuses to divide, and the other files a bill to settle up the partnership, when they go into all the wicked details of the conspiracy and the rencounter and treachery, will a court of justice hear them? No case can be found where a court of justice has allowed itself to be so abused. Now, if these robbers had taken the $1,000 and invested it in some legitimate business as partners, and had afterwards sought the aid of the court to settle up that legitimate business, the court would not have gone back to inquire how they first got the money; that would have been a past transaction not necessary to be mentioned in settlement of the new business. And this illustrates the case of *Brooks* v. *Martin,* supra.'' (*King* v. *Winants,* 71 N. C. 469, 17 Am. Rep. 11.) The case of *Morrison* v. *Bennett,* 20 Mont. 560, 40 L. R. A. 158, 52 Pac. 553, involved a transaction *malum per se,* not unlike the illustration of the division of the spoils between the highwaymen, made by the North Carolina court. Of course, in such a situation, no court would lend its aid in an accounting between the thieves, and the conclusion reached by this court in that case is in full accord with my views concerning such a transaction.

According to the contract between McManus and Fulton, McManus could have rightfully retained the commissions agreed to be paid him upon sale of the stock. The money, to the extent of his commissions, belonged to him, and no one other than a stock purchaser could have recovered the money from him because of the alleged illegality of the contract involving the sale of the stock. The transaction has been con-

summated. Fulton granted McManus an option to purchase the stock at sixty cents per share with the money to which McManus was entitled, and which he had received as commissions. Conceding, for the purpose of the argument, that the contract was illegal, and that there was no consideration for the option; Fulton could have refused to accept the money from McManus for the stock without incurring liability. He did not do so, however, but accepted from McManus the money representing McManus' commissions, which belonged to and was the individual property of McManus. If then, there was no enforceable contract, a new contract to deliver the stock immediately came into existence. In the case of *Raiche* v. *Morrison*, 47 Mont. 127, 130 Pac. 1074, it is said: "Under the rule applicable to such contracts, when the option to buy or sell is based upon a consideration moving to the promisor, the promisee has the exclusive right to sell or buy during the time specified in the contract. He may or may not exercise his option, yet the contract is binding upon the promisor. If not based upon a consideration, it may be withdrawn at the will of the promisor; nevertheless it is a standing offer which may be accepted by the promisee at any time during its life, and thus become a contract binding upon both parties. (*Ide* v. *Leiser*, 10 Mont. 5, 24 Am. St. Rep. 17, 24 Pac. 695, and cases cited.) If we regard defendant's promise either as based upon a consideration—that is, made as an inducement to the plaintiff to purchase stock—or as a continuing offer to repurchase made without any consideration, it became binding upon him when the plaintiff, at the date at which the option was to expire, accepted it and tendered the stock." Therefore, in order for McManus to recover, it is not necessary to prove more than that Fulton had given him an option to purchase stock at sixty cents per share, and that the offer to sell had not been withdrawn when Fulton received and accepted the money from McManus for the stock. Under these circumstances, it would be no defense that the option granted was in consideration of McManus selling stock in violation of the Blue Sky Law of Illinois. The transaction was closed,

and Fulton accepted the money from McManus knowing that McManus was paying him the money for the stock. This is not, therefore, an action to enforce an illegal contract, but an action to recover stock, or the value of stock, which Fulton, by accepting McManus' money, agreed to sell and deliver at the agreed price per share. The rule applicable is that announced in *Brooks* v. *Martin*, 2 Wall. 70, 17 L. Ed. 732, and in *Planters' Bank* v. *Union Bank*, 16 Wall. 483, 21 L. Ed. 473. In the Brooks-Martin case the right of recovery was based upon an illegal contract of partnership. It was necessary to prove the illegal contract. Nevertheless the court said: "Does it lie in the mouth of the partner who has, by fraudulent means, obtained possession and control of all these funds, to refuse to do equity to his other partners, because of the wrong originally done or intended to the soldier? It is difficult to perceive how the statute, enacted for the benefit of the soldier, is to be rendered any more effective by leaving all this in the hands of Brooks, instead of requiring him to execute justice as between himself and his partner; or what rule of public morals will be weakened by compelling him to do so? The title to the lands is not rendered void by the statute. It interposes no obstacle to the collection of the notes and mortgages. The transactions which were illegal have become accomplished facts, and cannot be affected by any action of the court in this case." So in this case, Fulton having received the money which belonged to McManus, knowing that it was paid for stock of like character as that which Fulton had agreed to sell to McManus, it does not lie in the mouth of Fulton, who would be perpetrating a fraud on McManus by accepting the money, and then refusing to deliver the stock because the contract, pursuant to which McManus paid in the money, to say that the transaction was illegal. As said in *Brooks* v. *Martin*, supra, "the transactions which were illegal have become accomplished facts, and cannot be affected by any action of the court in this case." And in the case before us it should always be kept in mind that the contract sued upon and established by the evidence was executed by the defendant person-

ally long after all of the plaintiff's earned commissions had been paid over in money intact to the defendant and subsequent to the date the plaintiff elected to convert such money into stock in accordance with the defendant's contract.

The authorities cited and relied upon by learned counsel for the defendant, as well as by the court, in the majority opinion, would be applicable if the contracts considered were with stock purchasers and by the statute declared to be absolutely void, and the plaintiff had not as yet collected the purchase money and paid it over to the defendant, but was suing to recover his agreed compensation. The fact that the controversy in this case is over the money which the plaintiff had received and to the extent of agreed commissions he could have rightfully retained, but which in fact he paid over to the defendant in the exercise of the option to purchase stock at sixty cents a share, distinguishes this case from such authorities.

If the Illinois Securities Act commanded unqualified denunciation of the contracts involved as void, Fulton's unconscionable cry might serve to make a public policy that would overwhelm McManus for his disregard of the law. In the absence of such a requirement, the law is better honored and respected by telling Fulton to disgorge and deliver to McManus the stock to which he is rightfully entitled, or damages for the breach of his contract.

HONORABLE A. J. HORSKY, District Judge, sitting in place of MR. JUSTICE FORD, disqualified: I concur in the views expressed by Mr. Justice GALEN.